IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

THOMAS MORE LAW CENTER; JANN
DeMARS; JOHN CECI; STEVEN
HYDER; and SALINA HYDER,

              Plaintiffs,

     v.

BARACK HUSSEIN OBAMA, in his
official capacity as President of the United
States; KATHLEEN SEBELIUS, in her
official capacity as Secretary, United States
Department of Health and Human Services;
ERIC H. HOLDER, JR., in his official
capacity as Attorney General of the United
States;  TIMOTHY F. GEITHNER, in his
official capacity as Secretary, United States
Department of Treasury,

              Defendants.

Case No. 2:10-cv-11156

**PLAINTIFFS' MOTION
FOR A PRELIMINARY
INJUNCTION & BRIEF
IN SUPPORT**

Hon. George C. Steeh

Mag. Judge R. Steven Whalen

THOMAS MORE LAW CENTER
Robert J. Muise, Esq. (P62849)
Richard Thompson, Esq. (P21410)
24 Frank Lloyd Wright Drive
P.O. Box 393
Ann Arbor, MI 48106
rmuise@thomasmore.org
(734) 827-2001
Fax: (734) 930-7160
*Co-Counsel for Plaintiffs*

LAW OFFICES OF DAVID YERUSHALMI, P.C.
David Yerushalmi, Esq. (Ariz. Bar No. 009616;
DC Bar No. 978179; Cal. Bar No. 132011; NY Bar No. 4632568)
P.O. Box 6358
Chandler, AZ 85246
david.yerushalmi@verizon.net
(646) 262-0500
Fax: (801) 760-3901
*Co-Counsel for Plaintiffs*

Plaintiffs Thomas More Law Center ("TMLC"), Jann DeMars, John Ceci, Steven Hyder, and Salina Hyder ("Plaintiffs"), by and through their undersigned counsel, hereby move this court for a preliminary injunction pursuant to Fed. R. Civ. P. 65 and E.D. Mich. LR 65.1 in order to prevent irreparable injury to Plaintiffs' fundamental rights and interests.

In support of their motion, Plaintiffs rely upon the pleadings and papers of record, as well as their brief filed with this motion and the declarations and exhibits attached thereto.

For the reasons set forth more fully in the accompanying brief, Plaintiffs hereby request that this court preliminarily enjoin the enforcement of the "Patient Protection and Affordable Care Act" (hereinafter referred to as the "Health Care Reform Act" or "Act"), which was signed into law by President Obama on March 23, 2010, and amended on March 30, 2010.[1] Specifically, Plaintiffs request that this court preliminarily enjoin the unconstitutional individual mandate provision of the Act, which requires private citizens, including Plaintiffs, to purchase or obtain health care coverage under penalty of federal law.

As stated in the attached certificate of service, a copy of this motion and brief was *personally served* on the U.S. Attorney for the Eastern District of Michigan, along with the service of the summonses and Complaint.  And a copy of this motion and brief was sent via certified mail along with a copy of the summonses and Complaint to all Defendants.  *See* Fed. R. Civ. P. 4(i).

Pursuant to E.D. Mich. LR 7.1, on April 5, 2010, there was a conference between attorneys from the U.S. Department of Justice in Washington, D.C. ("Main Justice")—who received a copy of Plaintiffs' motion and brief explaining the nature of the motion and its legal

---

[1] Relevant portions of the Health Care Reform Act are attached to this motion and brief as Exhibit 1, and relevant portions of the amendments are attached as Exhibit 2.

basis—and Plaintiffs' counsel.  During this conference, Plaintiffs' counsel requested but did not obtain concurrence in the relief sought by this motion.

WHEREFORE, Plaintiffs hereby request that this court grant their motion for a preliminary injunction.

Respectfully submitted,

THOMAS MORE LAW CENTER

/s/ Robert J. Muise
Robert J. Muise, Esq.

LAW OFFICES OF DAVID YERUSHALMI, P.C.

David Yerushalmi, Esq.

*Counsel for Plaintiffs*

**ISSUE PRESENTED**

Whether Congress exceeded its authority under the Constitution by mandating that private citizens, including Plaintiffs, purchase health care coverage under penalty of federal law.

**MOST APPROPRIATE & CONTROLLING AUTHORITY**

U.S. Const. art. I, § 8

*Gonzales v. Raich*, 545 U.S. 1 (2005)

*Planned Parenthood Ass'n of Cincinnati, Inc. v. Cincinnati*, 822 F.2d 1390 (6th Cir. 1987)

*United States v. Lopez*, 514 U.S. 549 (1995)

*United States v. Morrison*, 529 U.S. 598 (2000)

### BRIEF IN SUPPORT OF MOTION

This case challenges, *inter alia*,[2] an unconstitutional provision of the newly enacted "Patient Protection and Affordable Care Act" (hereinafter "Health Care Reform Act" or "Act"), which mandates that all private citizens, including Plaintiffs, purchase health care coverage under penalty of federal law (hereinafter "Individual Mandate").   Plaintiffs contend that Congress exceeded its authority under the Constitution by enacting this mandate.

As noted by the Congressional Budget Office as early as August 1994:

A mandate requiring all individuals to purchase health insurance would be *an unprecedented form of federal action*.  The government has *never* required people to buy any good or service as a condition of lawful residence in the United States.[3]  (emphasis added).

James Madison explained in the Federalist Papers: "In the first place it is to be remembered, that the general government is not to be charged with the whole power of making and administering laws.  Its jurisdiction is limited to certain enumerated objects. . . ."  *The Federalist* No. 14, at 65 (James Madison) (Carey & McClellan eds., 1990).

Here, there is no enumerated power in the Constitution that permits the federal government to mandate that Plaintiffs and other American "residents" purchase health care coverage or face a penalty.  No matter how convinced Defendants—or even the American public in general—may be that the Health Care Reform Act is in the public interest, their political objectives can only be accomplished in accord with the Constitution.

---

[2] Plaintiffs have also alleged that the Act violates their constitutional rights protected by the First (rights to conscience and the free exercise of religion), Fifth (equal protection and due process), and Tenth Amendments to the Constitution.  (*See* Compl. at Doc. No. 1).

[3] Congressional Budget Office, *The Budgetary Treatment of an Individual Mandate to Buy Health Insuranc*e, (1994), available at http://www.cbo.gov/ftpdocs/48xx/doc4816/doc38.pdf.   A copy of the relevant excerpt is attached as Exhibit 3.

The Health Care Reform Act represents an unprecedented encroachment on the liberty of all Americans, including Plaintiffs, by imposing unprecedented governmental mandates that restrict their personal and economic freedoms in violation of the Constitution.

In sum, the question posed by this motion is a legal one.[4]  Its resolution will have an immediate impact upon the lives of Plaintiffs and millions of other American citizens.[5]  And it will impact the fundamental relationship between the power of the federal government and the liberty interests of those it governs.  The judicial branch of our government is a guardian of those fundamental liberties, and it possesses the constitutional authority to enjoin governmental acts that tread upon them.  Plaintiffs respectfully request that this court exercise *its* authority by granting the requested injunction.

## RELEVANT FACTS

The Health Care Reform Act forces private citizens, including Plaintiffs, to purchase health care coverage under penalty of federal law.[6]  What is considered an acceptable or minimum essential level of health care coverage is determined by the federal government pursuant to the Act.  If a private citizen chooses not to purchase an acceptable level of health care coverage as determined by the federal government, Defendants impose monetary penalties.  (*See* Act at Ex. 1 at 321-26).

---

[4] "[W]hether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question, and can be settled finally only by this Court."  *United States v. Morrison*, 529 U.S. 598, 614 (2000) (citations and quotations omitted).

[5] Thirteen State attorneys-general, including the Attorney General of Michigan, have filed a federal lawsuit in Florida, challenging the Health Care Reform Act.  *Florida v. United States Dep't of Health & Human Servs.*, No. 3:10-cv-0091 (N.D. Fla. filed Mar. 23, 2010).

[6] Several amendments were made to the Act pursuant to the "reconciliation" process and signed into law on March 30, 2010.  (Amends. at Ex. 2).  The amendments do not change the legal analysis provided in this brief nor remedy the constitutional deficiencies of the Act.

Plaintiffs do not have private health care insurance.  They do not intend to purchase health care coverage.  And they object to being forced to purchase health care coverage under the Act. (DeMars Decl. at ¶¶ 2, 3, 5 at Ex. 4; Hyder Decl. at ¶¶ 2, 3, 5 at Ex. 5).  TMLC, through its members, similarly objects to being forced to purchase health care coverage under the Act.  (*See* Compl. at ¶¶ 10-12, 31 at Doc. No. 1; DeMars Decl. at ¶¶ 1-5 at Ex. 4; Hyder Decl. at ¶¶ 1-5 at Ex. 5).

Plaintiffs have arranged their personal affairs such that it will be a hardship for them to have to either pay for health insurance that is not necessary or desirable or face penalties under the Act.  The Act negatively impacts them now because they will have to reorganize their affairs and essentially change the way they presently live to meet the government's demands.  (DeMars Decl. at ¶ 5 at Ex. 4; Hyder Decl. at ¶ 5 at Ex. 5).  By refusing to purchase health care coverage, Plaintiffs are subject to penalties under the Act.  (*See* Act at Ex. 1 at 321-26).

The Act forces uninsured persons, such as Plaintiffs, to purchase private health care coverage not because they are even tangentially engaged in the production, distribution, or consumption of goods or commodities or any other commercial activity, but for no other reason than they, the uninsured residents, exist.  (Act at Ex. 1 at 321-26).

## ARGUMENT

The standard for issuing a preliminary injunction in this Circuit is well established.  In *Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998), the court stated:

> In determining whether or not to grant a preliminary injunction, a district court considers four factors: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff could suffer irreparable harm without the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of the injunction on the public interest.

*Id.; see also Hamilton's Bogarts, Inc. v. Michigan,* 501 F.3d 644, 649 (6th Cir. 2007) (quoting *Connection Distributing Co.*, 154 F.3d at 288).

Typically, the reviewing court will balance these factors, and no single factor will necessarily be determinative of whether or not to grant the injunction. *Connection Distributing Co.*, 154 F.3d at 288. However, when addressing an issue involving a constitutional challenge to a law—and thus a challenge involving the constitutional rights of the plaintiff—the crucial and often dispositive factor is whether the plaintiff is likely to prevail on the merits of his constitutional claim. *Id.*; *Planned Parenthood Ass'n of Cincinnati, Inc. v. Cincinnati*, 822 F.2d 1390 (6th Cir. 1987) (having found in favor of plaintiffs on the "substantial likelihood of success" factor, the court also approved "the district court's conclusion that the remaining three factors militate in favor of granting the injunction" because the challenged ordinance will likely be found unconstitutional); *cf. Gonzales v. Raich*, 545 U.S. 1 (2005) (reversing grant of preliminary injunction in as-applied challenge to federal law under the Commerce Clause).

As argued further below, there is a substantial likelihood that the Individual Mandate is unconstitutional, thereby causing irreparable harm to Plaintiffs and others, such that it would be in the public interest to grant the requested injunction.

**I.      Plaintiffs' Likelihood of Success on the Merits: The Act Violates the Commerce Clause because the Individual Mandate is a Regulation of Legal Residence or Mere "Existence" and Not a Class of Constitutionally Permissible Regulated Commercial Activity.**

If we are permitted to remove ourselves from the political factors weighing for or against health care reform, one statement is entirely uncontestable and, as a result, not subject to serious challenge: The federal government has never in the history of the United States attempted to

stretch the Commerce Clause to include the regulation of **inactivity**, or in effect, mere "existence" or residence within our Nation's boundaries.

For the first time in our history, Congress has cited the Commerce Clause as authority to regulate a man or woman sitting in the privacy of his or her own home doing absolutely nothing but breathing.  No previous interpretation of the Commerce Clause has ever allowed this reach. And, more importantly, if this is what the Commerce Clause has come to mean, it means the Commerce Clause is **the** enumerated power of the federal government without the need for any other enumerations because it would permit absolute power, save the exceptions carved out by constitutional amendments, such as the Bill of Rights.[7]   In this new scheme of governance, individual liberty is the exception against the backdrop of the federal government's plenary authority to regulate every aspect of our lives—including our choice to refrain from acting.

In the final analysis, this expansion of power effectively converts our Republic, designed as a federal system with a limited national government, into a single omnipresent national polity with absolute power to regulate all spheres of human existence.  Indeed, even the promulgation and enforcement of regulations once considered strictly within the confines of State and local governments under the rubric of police power, such as local sanitation codes, zoning ordinances, and municipal building codes, all would fall within Congress' power should that power include the ability to impose regulations such as the Individual Mandate at issue here.  Quite simply, if this is what the Commerce Clause means, then the federal government has the authority to

---

[7] As the government's Commerce Clause power expanded in the last century, the Tenth Amendment has proven incapable of preserving State's rights.  *See, e.g., Raich*, 545 U.S. at 1 (invalidating California statute authorizing personal, medicinal use of marijuana in the wake of the federal government's "comprehensive regulatory statutes [which] may be validly applied to local conduct that does not, when viewed in isolation, have a significant impact on interstate commerce").

regulate any and all behavior imaginable—including inactivity, as in this case.  Liberty is no longer an unalienable right possessed by the individual, but a political privilege or license granted by the State—that being the federal government.  This state of affairs effectively reverses the American Revolution and terminates the great experiment founded in the constitutional republic begun by our Founding Fathers.

> **A.**    **The Act Regulates All Legal U.S. Residents Who Have Chosen <u>Not</u> to Engage in the Commercial Activity of Purchasing Health Insurance.**

The Act creates an Individual Mandate for each "applicable individual" to purchase health insurance or be subject to what the Act calls appropriately a "penalty," and at times euphemistically a "Shared Responsibility Payment."  (Act at Ex. 1 at 321-22, 326-28).  The definition of an "applicable individual," which triggers this exercise of the federal government's Commerce Clause power, is mere existence because the definition begins with any individual and then provides three exclusions: (1) religious objectors who oppose health insurance in principle; (2) non-residents or illegal residents; and (3) incarcerated individuals.[8]  (Act at Ex. 1 at 326-28).

The act also exempts certain classes of individuals from the penalty, but includes them within the definition of an "applicable individual."  For example, individuals living under the statutorily defined "poverty line" are "applicable individuals" who must obtain health insurance, but are exempted from the penalty.  (*See* Act at Ex. 1 at 331).

---

[8] "The term 'applicable individual' means, with respect to any month, an individual other than an individual described in paragraphs (2), (3), or (4)."  (Act at Ex. 1 at 326).  Paragraph (d)(2) excludes "certified" religious objectors pursuant to 26 U.S.C. § 1401(g)(1), which is the religious objection provision contained in the self-employment income tax section of the Internal Revenue Code.  Paragraph 3 excludes non-residents of the United States or illegal residents.  And paragraph 4 excludes incarcerated individuals.  (*See* Act at Ex. 1 at 326-28).

In sum, the Act is triggered by mere residence or existence.  Persons subject to the Individual Mandate (and its penalty wielded as an enforcement club) include those otherwise law abiding citizens, including Plaintiffs, who have simply chosen not to purchase health insurance.

**B.      Plaintiffs Are Legal U.S. Residents Who Have Chosen Not to Enter into the Commercial Activity of Purchasing Health Insurance and as such Are Subject to a Penalty and Irreparable Harm.**

Plaintiffs are legal residents of the United States who have chosen not to purchase health insurance or obtain the government-mandated level of coverage required by the Act.  Plaintiffs do not object to health care or health insurance *per se* on religious grounds, and they are not incarcerated.  Because Plaintiffs do not intend at any time to engage in the commercial activity of purchasing health insurance, the Act imposes an immediate burden on them by forcing them to contemplate, plan, and effect substantial life changes to avoid the unconstitutional regulation and penalization for their refusal to engage in the mandated commercial activity.

**C.      The Commerce Clause Authorizes the Federal Government to Regulate Economic Activity that Affects Interstate Commerce.**

The Supreme Court has referred to the principles that establish the fundamental structure of our government embodied in the Constitution, which limits the powers of the federal government to those expressly enumerated, as "first principles":

> We start with first principles.  The Constitution creates a Federal Government of enumerated powers.  As James Madison wrote, "The powers delegated by the proposed Constitution to the federal government are few and defined.  Those which are to remain in the State governments are numerous and indefinite."  This constitutionally mandated division of authority was adopted by the Framers to ensure protection of our fundamental liberties.  Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front.

*United States v. Lopez*, 514 U.S. 549, 552 (1995) (internal citations and quotations omitted).

### 1.   Article I, Section 8 of the Constitution authorizes the federal government to regulate commerce "among the several States."

The first of the discreet enumerated powers of the federal government are set out in Article I, Section 8 of the Constitution.  The third of this first grouping of powers is the Commerce Clause, which grants Congress the power "[t]o regulate commerce with foreign nations, and among the several States, and with the Indian tribes."  U.S. Const. art. I, §8, cl. 3.

From the early days of our Republic until the present, the Supreme Court has confronted and grappled with the meaning and scope of the phrase "commerce . . . among the several States."  In the first of these cases, *Gibbons v. Ogden*, 22 U.S. 1 (1824), the Court held that "commerce" included more than just the "traffic" of goods from one state to another; it also included the regulation of commercial "intercourse," such as navigation on the country's waterways.  *Id.* at 189-90.  Over the course of the Commerce Clause's long and storied jurisprudence, the Court has mapped out a three-prong analysis to determine if a federal law (or a regulations promulgated pursuant to it) properly falls within this enumerated grant of authority.  *See Lopez*, 514 U.S. at 552-57, 568-74, 584 (KENNEDY, J., concurring); *id.* at 593-99 (THOMAS, J., concurring) (reviewing the history of Commerce Clause jurisprudence).

### 2.   The Court's three-prong analysis.

Beginning with *Perez v. United States,* 402 U.S. 146 (1971), every important Commerce Clause opinion has expressly adopted a three-prong analysis to test whether legislation falls

within the bounds of permissibly "regulated activities."[9] *Id.* at 150.  This inquiry presumes that Congress may regulate: (1) "the use of the channels of interstate commerce," such as regulations covering the interstate shipment of stolen goods; (2) to protect "the instrumentalities of interstate commerce, or persons or things in interstate commerce," such as legislation criminalizing the destruction of aircraft and theft from interstate commerce; and (3) "those activities that substantially affect interstate commerce."  *Lopez*, 514 at 558-59; *see also Perez*, 402 U.S. at 150.

While the first two categories are rather straightforward because they touch upon interstate commerce directly, it is the last category that has so vexed the Court.  Notwithstanding the vexation quotient of this prong, its rationale is manifestly plausible.  That is, while there are some local commercial activities that in themselves do not participate whatsoever in interstate commerce, they are nonetheless quite obviously commercial activities that "substantially affect" interstate commerce.

Two civil rights era cases of this sort are *Atlanta Motel v. United States,* 379 U.S. 241 (1964), and its companion case, *Katzenbach v. McClung,* 379 U.S. 294 (1964).  These cases involved a challenge to the then-recently enacted civil rights legislation, which prevented motel-hotel owners and restaurateurs, respectively, from discriminating against their "Negro" consumers.  The Court in those cases made clear that a purely local activity that substantially affects interstate commerce, such as providing lodging accommodations or food to customers traveling interstate and dealing in and consuming goods that were very much a part of interstate

---

[9]*See also Gonzales v. Raich*, 545 U.S. 1, 16-17 (2005); *United States v. Morrison*, 529 U.S. 598, 608-09 (2000); *United States v. Lopez*, 514 U.S. 549, 558-59 (1995); *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.,* 452 U.S. 264, 276-77 (1981).

commerce, is properly within the reach of the Commerce Clause because the local activity substantially and directly affects interstate commerce.

This third prong begins to vex, however, when the Court expands its reach to include a purely local, non-commercial activity, which may or may not ever affect interstate commerce, simply because it is an integral part of a broader statutory scheme that permissibly regulates interstate commerce. The two model cases of this sort—bookends separated by more than 60 years—are *Wickard v. Filburn,* 317 U.S. 111 (1942), and *Gonzales v. Raich*, 545 U.S. 1 (2005).

In *Wickard*, the Court held that a broad regulatory scheme permissibly regulating commercial, interstate agricultural activity could properly capture the non-commercial, economic activity of individual wheat farmers growing wheat for their own personal consumption precisely because this activity could have an adverse affect on the regulatory scheme's price control mechanisms. Similarly, in *Raich,* the Court concluded, relying in large part on *Wickard*, that non-commercial, home-grown, medicinal marijuana was permissibly captured by the legislative regulatory scheme because Congress could rationally conclude that some of this marijuana would leak into the illegal interstate commercial market, which was the central target of the statutory scheme.

Vexation is inescapable, however, because nestled in between *Wickard* and *Raich* are two modern cases which are widely understood to cabin the Commerce Clause's reach by prohibiting the federal regulation of purely local, non-commercial activity. Both *United States v. Lopez*, 514 U.S. 549 (1995), and *United States v. Morrison*, 529 U.S. 598 (2000), invalidated federal statutes which sought impermissibly to regulate purely local, non-commercial activity—activity Congress had concluded quite rationally could affect interstate commerce. Specifically, in

*Lopez,* the Court confronted the Gun-Free School Zone Act of 1990, which criminalized possession of a gun within a statutorily defined school zone.  It is worth a moment's pause here to follow the *Lopez* Court's reasoning in rejecting the Commerce Clause's reach into this domain of non-commercial activity:

> The Government's essential contention, *in fine*, is that we may determine here that § 922(q) [the provision of the legislation at issue] is valid because possession of a firearm in a local school zone does indeed substantially affect interstate commerce.  The Government argues that possession of a firearm in a school zone may result in violent crime and that violent crime can be expected to affect the functioning of the national economy in two ways.  First, the costs of violent crime are substantial, and, through the mechanism of insurance, those costs are spread throughout the population.  [*United States v. Evans*, 928 F.2d 858, 862 (9th Cir. 1991)].  Second, violent crime reduces the willingness of individuals to travel to areas within the country that are perceived to be unsafe. [*Cf. Heart of Atlanta Motel*, 379 U.S. at 253].  The Government also argues that the presence of guns in schools poses a substantial threat to the educational process by threatening the learning environment.  A handicapped educational process, in turn, will result in a less productive citizenry.  That, in turn, would have an adverse effect on the Nation's economic well-being.  As a result, the Government argues that Congress could rationally have concluded that § 922(q) substantially affects interstate commerce.

> We pause to consider the implications of the Government's arguments.  The Government admits, under its "costs of crime" reasoning, that Congress could regulate not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce.  Similarly, under the Government's "national productivity" reasoning, Congress could regulate any activity that it found was related to the economic productivity of individual citizens: family law (including marriage, divorce, and child custody), for example.  Under the theories that the Government presents in support of § 922(q), it is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign.  Thus, if we were to accept the Government's arguments, we are hard pressed to posit any activity by an individual that Congress is without power to regulate.

> Although Justice Breyer argues that acceptance of the Government's rationales would not authorize a general federal police power, he is unable to identify any activity that the States may regulate but Congress may not.  Justice Breyer posits that there might be some limitations on Congress' commerce power, such as

family law or certain aspects of education.  These suggested limitations, when viewed in light of the dissent's expansive analysis, are devoid of substance.

Justice Breyer focuses, for the most part, on the threat that firearm possession in and near schools poses to the educational process and the potential economic consequences flowing from that threat.  Specifically, the dissent reasons that (1) gun-related violence is a serious problem; (2) that problem, in turn, has an adverse effect on classroom learning; and (3) that adverse effect on classroom learning, in turn, represents a substantial threat to trade and commerce.  This analysis would be equally applicable, if not more so, to subjects such as family law and direct regulation of education.

For instance, if Congress can, pursuant to its Commerce Clause power, regulate activities that adversely affect the learning environment, then, a fortiori, it also can regulate the educational process directly.  Congress could determine that a school's curriculum has a "significant" effect on the extent of classroom learning.  As a result, Congress could mandate a federal curriculum for local elementary and secondary schools because what is taught in local schools has a significant "effect on classroom learning," and that, in turn, has a substantial effect on interstate commerce.

*Lopez*, 514 U.S. at 564-65 (1995) (internal citations and references omitted).  What is striking about *Lopez* is that it can hardly be argued that it was irrational for Congress to have concluded that possessing guns near schools would affect interstate commerce.  It is no less of an "effect" than the possible leakage of private, homegrown, medicinal marijuana fully regulated by California.  But what is apparent from the lengthy quote above is that the *Lopez* Court understood that if the multi-tiered inference required to move from gun possession to an "effect" on interstate commerce was an appropriate nexus for upholding the constitutionality of a regulation, that inference would obliterate the Constitution's enumeration of powers.

*Morrison*'s result was similar and no less vexatious for the older *Wickard* and the yet to be rendered *Raich*.  This is especially true because in *Morrison*, unlike in *Lopez*, Congress had made a host of explicit findings supporting its legislation allowing a federal private right of action for a woman violently assaulted in a "gender-based" crime.  There the Court held:

In contrast with the lack of congressional findings that we faced in *Lopez*, § 13981 [the provision of the federal legislation at issue] *is* supported by numerous findings regarding the serious impact that gender-motivated violence has on victims and their families. But the existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation. As we stated in *Lopez*, "Simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so." Rather, "whether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question, and can be settled finally only by this Court."

In these cases, Congress' findings are substantially weakened by the fact that they rely so heavily on a method of reasoning that we have already rejected as unworkable if we are to maintain the Constitution's enumeration of powers. Congress found that gender-motivated violence affects interstate commerce "by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved in interstate commerce; . . . by diminishing national productivity, increasing medical and other costs, and decreasing the supply of and the demand for interstate products." Given these findings and petitioners' arguments, the concern that we expressed in *Lopez* that Congress might use the Commerce Clause to completely obliterate the Constitution's distinction between national and local authority seems well founded. The reasoning that petitioners advance seeks to follow the but-for causal chain from the initial occurrence of violent crime (the suppression of which has always been the prime object of the States' police power) to every attenuated effect upon interstate commerce. If accepted, petitioners' reasoning would allow Congress to regulate any crime as long as the nationwide, aggregated impact of that crime has substantial effects on employment, production, transit, or consumption. Indeed, if Congress may regulate gender-motivated violence, it would be able to regulate murder or any other type of violence since gender-motivated violence, as a subset of all violent crime, is certain to have lesser economic impacts than the larger class of which it is a part.

*Morrison*, 529 U.S. at 614-15 (internal quotations and citations omitted).

Ultimately, the majority opinion in *Raich* (and Justice Scalia's concurrence) struggled mightily with the third prong of the Commerce Clause. This struggle was necessitated by the incongruity and inconsistency of the Court's own jurisprudence. One version of the Commerce Clause forbade federal regulation to reach non-economic, local activity even if that activity in the

aggregate might very well materially impact interstate commerce (per *Lopez* and *Morrison*).  The other version of the Commerce Clause was understood to reach wholly private, non-commercial activity, like growing your own wheat or cultivating your own personal marijuana for medicinal purposes, neither of which might ever actually affect interstate commerce (per *Wickard* and *Raich*).  But, thankfully, *Raich* does not leave the vexing problem unattended.

The Court in *Raich* explained how to reconcile the differences between these two pairs of Commerce Clause decisions.  This reconciliation rests in the distinction between ***economic activities*** and ***non-economic activities***: The legislation at issue in *Lopez* and *Morrison* impermissibly dealt with local criminal behavior that was rooted in violence, but which had no necessary economic nexus as an activity.  That is, the carrying of a gun or violence against a woman is not economic activity in any generic way.  *Wickard* and *Raich*, however, permissibly regulated local, non-commercial activity because the cultivation of an agricultural product and a regulated drug were intrinsically ***economic*** activities.  In the Court's own words:

> Despite congressional findings that such crimes [violence against women in *Morrison*] had an adverse impact on interstate commerce, we held the statute unconstitutional because, like the statute in *Lopez*, it did not regulate economic activity.  We concluded that "the noneconomic, criminal nature of the conduct at issue was central to our decision" in *Lopez*, and that our prior cases had identified a clear pattern of analysis: "Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained." [*Morrison*, 529 U.S. at 610].

> Unlike those at issue in *Lopez* and *Morrison*, the activities regulated by the [federal Controlled Substances Act ("CSA"), which criminalized even private, medicinal marijuana,] are quintessentially economic.  "Economics" refers to "the production, distribution, and consumption of commodities."  *Webster's Third New International Dictionary* 720 (1966).  The CSA is a statute that regulates the production, distribution, and consumption of commodities for which there is an established, and lucrative, interstate market.  Prohibiting the intrastate possession or manufacture of an article of commerce is a rational (and commonly utilized) means of regulating commerce in that product.  Such prohibitions include specific decisions requiring that

14

a drug be withdrawn from the market as a result of the failure to comply with regulatory requirements as well as decisions excluding Schedule I drugs entirely from the market.   Because the CSA is a statute that directly regulates economic, commercial activity, our opinion in *Morrison* casts no doubt on its constitutionality.

*Raich*, 545 U.S. at 25-26.

The point of this Commerce Clause analysis, whether in the expansive rulings of *Wickard* and *Raich* or the more careful federalism-sensitive rulings of *Lopez* and *Morrison*, is that these cases and every single other Commerce Clause decision since this Nation's founding unanimously and explicitly hold that *congressional power under this clause is strictly and absolutely limited to some kind of affirmative behavior or activity*.  Whether it's the "economic activity" of the non-commercial growing of wheat (*Wickard*) or marijuana (*Raich*) within the broad permissible legislative scheme or the commercial activity of providing lodging and food services to interstate travelers in *Atlanta Motel* or *Katzenbach*, before Congress can reach you through the Commerce Clause, *you must be engaged in some affirmative activity*.

Moreover, as confirmed by *Lopez, Morrison*, and *Raich*, activity alone (like possessing a gun or assaulting a woman)—even if it will affect interstate commerce in the aggregate over time—is not enough to cross the Commerce Clause Rubicon.  The activity must be *economic*. But this means, at the very least, that there must be *some activity* to apply the Commerce Clause analysis.  And, as *Lopez*, *Morrison*, and *Raich* make clear, that activity must in and of itself be economic even if it need not be commercial.

### D.     The Act Does Not Regulate Economic Activity, but Rather the Choice Not to Engage in Commercial or Economic Activity by Penalizing the Inactivity.

The Act does not even pretend to fit within any of the Court's previous Commerce Clause rulings.  The Individual Mandate attaches to a legal resident of the United States who

chooses to sit at home and do nothing.  This resident is, quite literally, merely existing.  He or she is neither engaged in economic activity nor in any other activity that would bring him or her within the reach of even a legitimate regulatory scheme.  *Lopez*, 514 U.S. at 561 (holding that the non-commercial ***activity*** must be an "***essential*** part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated") (emphasis added).  In this case, we have neither economics nor activities.

The Act purports to provide legislative findings to support Congress's authority to enact the Individual Mandate under the Commerce Clause.  According to the Act: "The individual responsibility requirement provided for in this section . . . is commercial and economic in nature, and substantially affects interstate commerce, as a result of the effects described in paragraph (2)."  (Act at Ex. 1 at 317-18).  Paragraph (2) sets forth various "effects on the national economy and interstate commerce" to support mandating the "individual responsibility requirement."  These findings make statements about the general economic and commercial impact health care and health care insurance have on the national economy and how much of that impact is harmful to health care generally and to the individual specifically.  The legislative findings conclude by suggesting that the proposed legislation ameliorates these deleterious effects of the current system.  (Act at Ex. 1 at 318-21).

Plaintiffs assume for purposes of this litigation that the national health care system is in need of repair.  Plaintiffs acknowledge that the health care delivery system in general and the health care insurance markets in particular fall within the Commerce Clause analysis described above.  But none of these legislative findings are at all relevant to the issue this lawsuit—and this motion—raises as a matter of law: whether the federal government has authority under the

16

Commerce Clause *to force* Plaintiffs and other similarly situated persons *to purchase* insurance from specific vendors[10] or suffer the consequences of a federally-imposed penalty.

Indisputably, Plaintiffs—as volitionally uninsured legal residents of the United States—are not now engaged in any commercial or economic activity that affects in any way interstate commerce.  This is because, unlike *Wickard* and *Raich*, or *Atlanta Motel* and *Katzenbach*, Plaintiffs are not engaged in any economic activity whatsoever relative to the legislative findings of the Act or the regulatory scheme of the Act—essential or otherwise.

As the Court forcefully pointed out in both *Lopez* and *Morrison*, the national government is restrained and constrained by federalism not to go beyond its discreet and enumerated powers.  This fundamental requirement of our federal government, which is and remains the law of the land, was described by the Supreme Court as a "first principle."  Under the Commerce Clause, Congress is limited to regulating *at the far reaches of its authority* only local *economic* activity that it rationally determines is an "essential part of a larger regulation of ***economic*** activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated."  *See Lopez*, 514 U.S. at 561 (emphasis added).

But these *far reaches* of congressional authority fall *far short* of this case because the regulatory scheme of the Act seeks to reach not just economic activity, but mere existence and inactivity.  Thus, the Act seeks to mandate that Plaintiffs cease their inactivity, and it further designs a penalty scheme to deprive Plaintiffs of their liberty to choose ***not*** to engage in a private commercial transaction.  If the Act is understood to fall within Congress' Commerce Clause authority, the federal government will have the absolute and unfettered power to create complex

---

[10] Only "qualified" health plans satisfy the Individual Mandate.  (Act at Ex. 1 at 102-18, 333-34).

regulatory schemes to fix every perceived problem imaginable and to do so by ordering private citizens to engage in affirmative acts, under penalty of law, such as taking vitamins, losing weight, joining health clubs, buying a GMC truck, or purchasing an AIG insurance policy, among others.  The term "Nanny State" does not even begin to describe what we will have wrought if in fact the Health Care Reform Act falls within any imaginable governmental authority.  To be sure, George Orwell's *1984* will be just the primer for our new civics.

## II.        Irreparable Harm to Plaintiffs without the Injunction.

Plaintiffs are presently harmed because the Act is in effect and they must now rearrange their personal affairs to either pay for health care coverage mandated by the government or pay a penalty.[11]  As case law makes plain, an injury is irreparable if it cannot be undone through monetary remedies.  *See Performance Unlimited v. Questar Publishers,* 52 F.3d 1373, 1382 (6th Cir. 1995); *Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera,* 762 F.2d 464, 473 (5th Cir. 1985) ("The absence of an available remedy by which the movant can later recover monetary damages . . . may also be sufficient to show irreparable injury.").  This case seeks declaratory and injunctive relief for a violation of the Constitution.  There are no monetary damages available to Plaintiffs as a matter of law.  *See, e.g., United States v. Sherwood,* 312 U.S. 584 (1941) (barring suit for damages on account of sovereign immunity).

Moreover, when an alleged violation of the Constitution is involved, most courts do not require a further showing of irreparable injury.  *See Elrod v. Burns,* 427 U.S. 347, 373 (1976); 11 C. Wright and A. Miller, *Federal Practice and Procedure, Civil*, § 2948 at 440 ("[W]here an alleged deprivation of a constitutional right is involved, most courts hold that no further showing

---

[11] Of course, Plaintiffs could change their residence or even their religion so as to fit within one of the enumerated exceptions.  But this too would impose an undue hardship and burden.

of irreparable injury is necessary.").  This includes alleged violations of the Commerce Clause. *See Citicorp Servs., Inc. v. Gillespie,* 712 F. Supp. 749, 753-54 (N.D. Cal. 1989) (finding that a Commerce Clause "violation alone should give rise to a presumption of irreparable harm"); *C & A Carbone, Inc. v. Town of Clarkstown,* 770 F. Supp. 848, 854 (S.D.N.Y. 1991) (finding that a Commerce Clause violation "unquestionably constitutes irreparable injury"); *see also Government Suppliers Consolidating Servs., Inc. v. Bayh,* 734 F. Supp. 853, 864 (S.D. Ind. 1990) (find that a regulation which violates the Commerce Clause causes irreparable injury regardless of a showing of economic harm).

## III.    Whether Granting the Injunction Will Cause Substantial Harm to Others.

The likelihood of harm to Plaintiffs is substantial because they are subject to an unconstitutional federal law and penalties for no other reason than that they are American citizens who do not want to purchase health care coverage.  If the Individual Mandate provision of the Act is found unconstitutional, it will benefit other similarly situated persons who do not want to be compelled by the federal government to purchase health care coverage.  Those who do want to purchase health care coverage can still do so.  And persons who are otherwise provided health care benefits under the Act will remain eligible to receive them since the only provision challenged here is the Individual Mandate.

By granting the preliminary injunction, this court will be returning the situation to the *status quo* with regard to individuals who want to retain the liberty right to decide for themselves whether or not to purchase health care coverage, and if so, at what level, without government intrusion, interference, or penalty.  Under these circumstances, it is implausible that Defendants or any other persons will be substantially harmed by the granting of an injunction.

In the final analysis, the question of harm to others as well as the impact on the public interest generally cannot be addressed properly without first determining whether there is a constitutional violation. For if the Individual Mandate is unconstitutional, the harm to others is less consequential since it is in the interest of all Americans that our government act in accord with the Constitution. *Planned Parenthood Ass'n of Cincinnati,* 822 F.2d at 1400.

## IV.     The Impact of the Injunction on the Public Interest.

The impact of the injunction on the public interest turns in large part on whether this court finds that there is a substantial likelihood that the Individual Mandate is unconstitutional. As the Sixth Circuit observed, "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994); *see Planned Parenthood Ass'n of Cincinnati,* 822 F.2d at 1400 (noting that "the public is certainly interested in the prevention of enforcement of ordinances which may be unconstitutional").

## CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that this court grant their motion.

Respectfully submitted,

THOMAS MORE LAW CENTER

/s/ Robert J. Muise
Robert J. Muise, Esq. (P62849)

LAW OFFICES OF DAVID YERUSHALMI, P.C.

David Yerushalmi, Esq.

**CERTIFICATE OF SERVICE**

I hereby certify that on April 6, 2010, a copy of the foregoing PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION & BRIEF IN SUPPORT was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the court's electronic filing system.  Parties may access this filing through the court's system. I further certify that a copy of the foregoing has been served as follows:

1.    A copy of the foregoing was personally served on April 5, 2010, upon the U.S. Attorney for the Eastern District of Michigan;

2.    Attorneys from the U.S. Department of Justice in Washington, D.C. ("Main Justice") confirmed via teleconference with Plaintiffs' counsel on April 5, 2010, that they had a copy of the foregoing;

3.    A copy of the foregoing was served via certified mail on April 5, 2010, upon the President of the United States, the Secretary of the U.S. Department of Health and Human Services, the Attorney General of the United States, and the Secretary of the U.S. Department of Treasury.

THOMAS MORE LAW CENTER

/s/ Robert J. Muise
Robert J. Muise, Esq. (P62849)