# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

|  |  |  |
|---|---|---|
| THOMAS MORE LAW CENTER; JANN DeMARS; JOHN CECI; STEVEN HYDER; and SALINA HYDER, | ) ) ) | Case No. 2:10-cv-11156 |
|  | ) | |
| Plaintiffs, | ) ) ) | **DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND** |
| v. | ) ) | **BRIEF IN SUPPORT** |
|  | ) | |
| BARACK HUSSEIN OBAMA, in his | ) | Hon. George C. Steeh |
| official capacity as President of the United | ) | |
| States; KATHLEEN SEBELIUS, in her | ) | Mag. Judge R. Steven Whalen |
| official capacity as Secretary, United States | ) | |
| Department of Health and Human Services; | ) | |
| ERIC H. HOLDER, JR., in his official | ) | |
| capacity as Attorney General of the United | ) | |
| States; TIMOTHY F. GEITHNER, in his | ) | |
| official capacity as Secretary, United States | ) | |
| Department of Treasury, | ) | |
|  | ) | |
| Defendants. | ) | |
|  | ) | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iii

ISSUES PRESENTED................................................................................... x

CONTROLLING OR MOST APPROPRIATE AUTHORITIES ................................ xi

PRELIMINARY STATEMENT ....................................................................... 1

ARGUMENT ............................................................................................ 8

I.      THIS COURT LACKS SUBJECT MATTER JURISDICTION ........................... 9

       A.     Plaintiffs Lack Standing Because the Minimum Coverage Provision Does Not Inflict Any Actual or Imminent Injury ....................... 9

            1.     Requirements for Standing ............................................. 9

            2.     Plaintiffs Cannot Show an Injury in Fact ..................... 10

       B.     Plaintiffs' Claims Are Unripe .................................................. 13

       C.     The Anti-Injunction Act Bars Plaintiffs' Claims ...................... 14

II.     PLAINTIFFS HAVE NOT SHOWN THAT THEY ARE LIKELY TO SUFFER IRREPARABLE HARM IF THE PRELIMINARY INJUNCTION IS DENIED ....................................................................................... 16

III.    PLAINTIFFS CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS ................................................................................. 18

       A.     The Minimum Coverage Provision Is a Valid Exercise of Congress's Power to Regulate Interstate Commerce. .................................. 18

            1.     The Minimum Coverage Provision Prevents Cost-Shifting in the Health Care Market, and Therefore Regulates Economic Activities That Substantially Affect Interstate Commerce .......... 21

            2.     The Minimum Coverage Provision Is an Essential Part of the Act's Broader Regulatory Scheme ............................ 24

       B.     The Minimum Coverage Provision Is Constitutional as an Exercise

of the Power to Tax and Spend to Provide for the General Welfare .........27

IV.   THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST
      WEIGH STRONGLY AGAINST GRANTING PRELIMINARY RELIEF ........31

CONCLUSION...........................................................................................................................32

# TABLE OF AUTHORITIES

## Federal Cases

Abbott Laboratories v. Gardner,
        387 U.S. 136 (1967) ........................................................................................ 13

Alexander v. "Americans United" Inc.,
        416 U.S. 752 (1974) ........................................................................................ 16

Ashcroft v. Iqbal,
        129 S. Ct. 1937 (2009) .................................................................................... 13

Ashwander v. Tennessee Valley Authority,
        297 U.S. 288 (1936) .......................................................................................... 1

Barr v. United States,
        736 F.2d 1134 (7th Cir. 1984) ........................................................................ 15

Bartley v. United States,
        123 F.3d 466 (7th Cir. 1997) .......................................................................... 15

Beacon Theatres, Inc. v. Westover,
        359 U.S. 500 (1959) ........................................................................................ 16

Bell Atlantic Corp. v. Twombly,
        550 U.S. 544 (2007) ........................................................................................ 13

Blanchette v. Conn. General Insurance Corp.,
        419 U.S. 102 (1974) ........................................................................................ 14

Bob Jones University v. Simon,
        416 U.S. 725 (1974) .............................................................................. 15, 17, 29

Buckley v. Valeo,
        424 U.S. 1 (1976) ............................................................................................ 31

C & A Carbone, Inc. v. Town of Clarkstown,
        770 F. Supp. 848 (S.D.N.Y. 1991) ................................................................ 18

Citicorp Services, Inc. v. Gillespie,
        712 F. Supp. 749 (N.D. Cal. 1989) ................................................................ 17

Cutter v. Wilkinson,
    423 F.3d 579 (6th Cir. 2005) ......................................................................... 28

Daniel v. Paul,
    395 U.S. 298 (1969) ....................................................................................... 23

Doe by Doe v. Cowherd,
    965 F.2d 109 (6th Cir. 1992) ........................................................................... 1

Elrod v. Burns,
    427 U.S. 347 (1976) ....................................................................................... 17

FDA v. Brown & Williamson Tobacco Corp.,
    529 U.S. 120 (2000) ................................................................................. 7, 30

Friends of the Earth, Inc. v. Laidlaw Environmental Services,
    528 U.S. 167 (2000) ....................................................................................... 10

Frothingham v. Mellon,
    262 U.S. 447 (1923) ....................................................................................... 17

Gonzales v. Raich,
    545 U.S. 1 (2005) ........................................................... 7, 18, 19, 20, 22, 23, 26

Government Suppliers Consolidating Services v. Bayh,
    734 F. Supp. 853 (S.D. Ind. 1990) ................................................................ 16

Grand Lodge of Fraternal Order of Police v. Ashcroft,
    185 F. Supp. 2d 9 (D.D.C. 2001) .............................................................. 13, 14

Heart of Atlanta Motel v. United States,
    379 U.S. 241 (1964) ....................................................................................... 23

Hecht Co. v. Bowles,
    321 U.S. 321 (1944) ....................................................................................... 32

Hein v. Freedom from Religion Foundation,
    551 U.S. 587 (2007) ....................................................................................... 17

Heller v. Doe by Doe,
    509 U.S. 312 (1993) ......................................................................................... 1

Helvering v. Davis,
    301 U.S. 619 (1937) ................................................................................. 7, 28

iv

Hylton v. United States,
    3 U.S. (3 Dall.) 171 (1796) ................................................................. 30

License Tax Cases,
    72 U.S. (5 Wall.) 462 (1867) ...................................................... 7, 27, 28

Lujan v. Defenders of Wildlife,
    504 U.S. 555 (1992) ............................................................... 9, 12, 13

M'Culloch v. Maryland,
    4 Wheat. 316 (1819) ......................................................................... 27

Manakee Prof'l Medical Transfer Serv. v. Shalala,
    71 F.3d 574 (6th Cir. 1995) ............................................................ 17

Marchetti v.United States,
    390 U.S. 39 (1968). .......................................................................... 29

McConnell v. FEC,
    540 U.S. 93 (2003) ..................................................................... 11, 13

McCray v. United States,
    195 U.S. 27 (1904) ........................................................................... 27

National Family Planning & Reproductive Health Association v. Gonzales,
    468 F.3d 826 (D.C. Cir. 2006) ....................................................... 13

Pac. Insurance Co. v. Soule,
    74 U.S. (7 Wall.) 433 (1868) ........................................................... 30

Pollock v. Farmers' Loan & Trust Co.,
    158 U.S. 601 (1895) ......................................................................... 30

Prime Media, Inc. v. City of Brentwood,
    485 F.3d 343 (6th Cir. 2007) ........................................................... 9

Rosen v. Tenn. Commissioner of Finance & Admin.,
    288 F.3d 918 (6th Cir. 2002) ........................................................... 12

Sabri v. United States,
    541 U.S. 600 (2004) ......................................................................... 27

Sampson v. Murray,
    415 U.S. 61 (1974) ........................................................................... 16

v

Shain v. Veneman,
    376 F.3d 815 (8th Cir. 2004) ........................................................ 11

Sonzinsky v. United States,
    300 U.S. 506 (1937) ...................................................................... 29

South Dakota v. Dole,
    483 U.S. 203 (1987) ...................................................................... 28

Steel Co. v. Citizens for a Better Environment,
    523 U.S. 83 (1998) ......................................................................... 1

Thomas v. Union Carbide Agriculture Products Co.,
    473 U.S. 568 (1985) ................................................................ 13, 14

Toilet Goods Association v. Gardner,
    387 U.S. 158 (1967) ...................................................................... 14

Tyler v. United States,
    281 U.S. 497 (1930) ...................................................................... 30

United States v. Birmley,
    529 F.2d 103 (6th Cir. 1976) ....................................................... 29

United States v. Butler,
    297 U.S. 1 (1936) .......................................................................... 27

United States v. Clintwood Elkhorn Mining Co.,
    553 U.S. 1 (2008) .......................................................................... 16

United States v. Doremus,
    249 U.S. 86 (1919) ........................................................................ 27

United States  v. Edward Rose & Sons,
    384 F.3d 258 (6th Cir. 2004) ....................................................... 16

United States v. Kahriger,
    345 U.S. 22 (1953) ........................................................................ 29

United States v. Manufacturers National Bank of Detroit,
    363 U.S. 194 (1960) ...................................................................... 30

United States v. Miami University,
    294 F.3d 797 (6th Cir. 2002) ....................................................... 31

United States v. Morrison,
     529 U.S. 598 (2000)................................................................................. 18

United States v. Oakland Cannabis Buyers' Co-op.,
     532 U.S. 483 (2001)................................................................................. 32

United States v. Sanchez,
     340 U.S. 42 (1950)........................................................................... 27, 28

United States v. South-Eastern Underwriters Association,
     322 U.S. 533 (1944)............................................................................ 2, 24

United States v. Suarez,
     263 F.3d 468 (6th Cir. 2001) ................................................................. 18

United States v. Thompson,
     361 F.3d 918 (6th Cir. 2004) ................................................................. 29

Weinberger v. Romero-Barcelo,
     456 U.S. 305 (1982)................................................................................. 31

Whitmore v. Arkansas,
     495 U.S. 149 (1990)................................................................................... 9

Wickard v. Filburn,
     317 U.S. 111 (1942).................................................................... 19, 22, 23

Winter v. Natural Resources Defense Council,
     129 S. Ct. 365 (2008)................................................................................. 8

Wuliger v. Manufacturers Life Insurance Co.,
     567 F.3d 787 (6th Cir. 2009) ................................................................. 12

**Federal Statutes**

26 U.S.C. § 4980B ....................................................................................... 29

26 U.S.C. § 4980D ....................................................................................... 29

26 U.S.C. § 5000A ............................................................... 5, 6, 12, 15, 28, 30

26 U.S.C. § 6671(a) ..................................................................................... 15

26 U.S.C. § 7421(a) ..................................................................................... 15

26 U.S.C. § 7422 ....................................................................................... 17

26 U.S.C. § 9301 ....................................................................................... 25

28 U.S.C. § 2201(a) .................................................................................. 15

29 U.S.C. § 1181(a) .................................................................................. 25

42 U.S.C. § 300gg ..................................................................................... 25

Pub. L. No. 99-272 ................................................................................... 25

Pub. L. No. 93-406 ................................................................................... 24

Pub. L. No. 104-191 ................................................................................. 25

Pub. L. No. 104-204 ................................................................................. 25

Pub. L. No. 105-277 ................................................................................. 25

Pub. L. No. 110-343 ................................................................................. 25

Pub. L. No. 111-148 .......................................................................... <u>passim</u>

Pub L. No. 111-152 ................................................................................... 2

U.S. Const. amend. XVI ........................................................................... 30

U.S. Const. art. I, § 8, cl. 1 ................................................................... 7, 27

U.S. Const. art. I, § 8, cl. 3 ..................................................................... 18

## Legislative Materials

155 Cong. Rec. H4771 (April 27, 2009) .................................................. 22

155 Cong. Rec. H6608 (June 11, 2009) ................................................... 22

155 Cong. Rec. H8002-8003 (July 10, 2009) .......................................... 22

<u>State Coverage Initiatives: Hearing before the Subcomm.</u>
     <u>on Health of the H. Comm. on Ways and Means</u>, 110th Cong. 7 (2008) ........................ 24

Health Reform in the 21st Century: Insurance Market Reforms:
    Hearing before the H. Comm. on Ways and Means, 111th Cong. 13 (2009)................... 26

S. Rep. No. 111-89 (2009) ........................................................................................................... 2

**Miscellaneous**

Cong. Budget Office, Key Issues in Analyzing Major Health Insurance Proposals
    (2008).......................................................................................................... 2, 3, 21, 22

Cong. Budget Office, The Long-Term Budget Outlook (2009) ...................................................... 2

Council of Economic Advisers, Economic Report of the President (2010) ................................ 22

Letter from Douglas W. Elmendorf, Director, CBO, to the Hon.
    Nancy Pelosi, Speaker, U.S. House of Representatives (Mar. 20, 2010) ...........…......29, 31

U.S. Census Bureau, Income, Poverty, and Health Insurance Coverage in the United States:
    2008 (2009) ................................................................................................................... 2

## <u>ISSUES PRESENTED</u>

1.  Whether plaintiffs have standing to challenge the minimum coverage provision, which does not take effect until January 1, 2014 and may not affect plaintiffs even then.

2.  Whether plaintiffs' challenge to the minimum coverage provision is ripe, given that the provision does not take effect until January 1, 2014 and may not affect plaintiffs even then.

3.  Whether the Anti-Injunction Act, 26 U.S.C. § 7421(a), bars plaintiffs from obtaining an injunction against the assessment or collection of the penalty under the minimum coverage provision.

4.  Whether, if this Court determines that it has subject matter jurisdiction, plaintiffs meet the prerequisites for the extraordinary relief they seek.

    A.  Whether plaintiffs have established that preliminary equitable relief now is necessary to spare them irreparable harm even though the minimum coverage provision will not take effect until 2014.

    B.  Whether plaintiffs have shown they are likely to succeed on the merits of their claims that the Patient Protection and Affordable Care Act is not a proper exercise of Congress's power to regulate interstate commerce or its authority to collect revenue and make expenditures for the general welfare.

    C.  Whether plaintiffs have established that the balance of equities and the public interest favor preliminary injunctive relief to stop comprehensive regulation of the health care market that Congress deemed essential to public health and economic well-being.

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

**CASES:**

Gonzales v. Raich, 545 U.S. 1 (2005)

Wickard v. Filburn, 317 U.S. 111 (1942)

United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533 (1944)

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992)

McConnell v. FEC, 540 U.S. 93 (2003)

Wuliger v. Mfrs. Life Ins. Co. 567 F.3d 787 (6th Cir. 2009)

Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009)

Bob Jones Univ. v. Simon, 416 U.S. 725 (1974)

## CONSTITUTIONAL AND STATUTORY PROVISIONS:

U.S. Const. art. I, § 8

26 U.S.C. § 7421(a)

## PRELIMINARY STATEMENT

In <u>Ashwander v. Tennessee Valley Authority</u>, Justice Louis Brandeis highlighted the concerns raised in a democracy when unelected judges pass "upon the validity of an act of Congress," and noted the Supreme Court's efforts in response to restrict "this function by rigid insistence that the jurisdiction of federal courts is limited to actual cases and controversies." <u>Ashwander</u>, 297 U.S. 288, 345-46 (1936) (Brandeis, J., concurring).  Since then, courts have consistently implemented this bedrock principle of judicial restraint — that courts should decide specific cases, not set policy — by permitting only those who suffer actual or imminent injury to bring a constitutional challenge to a statute.  <u>See, e.g.</u>, <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 101-102 (1998) ("For a court to pronounce upon the meaning or the constitutionality of a state or federal law when it has no jurisdiction to do so is, by very definition, for a court to act ultra vires."); <u>Doe by Doe v. Cowherd</u>, 965 F.2d 109, 111 (6th Cir. 1992) (holding that courts "may strike down legislation only at the instance of one who is himself immediately harmed or immediately threatened with harm by the challenged action"), <u>rev'd on other grounds sub nom.</u> <u>Heller v. Doe by Doe</u>, 509 U.S. 312 (1993).  Plaintiffs here, the Thomas More Law Center ("TMLC") and four individuals, do not come close to satisfying this threshold standing requirement.  They bring this suit four years before the provision they challenge takes effect, demonstrate no current injury, and merely speculate whether the law will harm them once it is in force.  Nonetheless, plaintiffs demand immediate, preliminary, injunctive relief barring implementation of the Act.  Because plaintiffs lack standing, and because they meet none of the prerequisites for such emergency relief, their motion for a preliminary injunction should be denied.

1

Through the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), ("PPACA" or "the Act"), amended by the Health Care and Education Reconciliation Act of 2010, Pub L. No. 111-152, 124 Stat. 1029 (2010) ("HCERA"), Congress engaged in comprehensive regulation of the vast, national health care market, including regulation of the way in which health care services are paid for.  In its legislative findings supporting the PPACA, Congress estimated that Americans spent $2.5 trillion on health care in 2009.  PPACA § 1501(a)(2)(B).  One of every five dollars in the 2009 federal budget related to health care, touching the lives of nearly every American.  Cong. Budget Office, The Long-Term Budget Outlook 6 (2009).  These massive and spiraling health care costs now pose a serious threat to the U.S. economy.  Id. at 21, 35; S. Rep. No. 111-89, at 1 (2009).

The health care industry operates in interstate commerce, and there is a long-recognized federal interest in its regulation.  PPACA §§ 1501(a)(2)(B), 10106(a); see United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533 (1944).  Most Americans pay for health care services by carrying third-party insurance or participating in federal health insurance programs such as Medicare and Medicaid.  See Cong. Budget Office, Key Issues in Analyzing Major Health Insurance Proposals 4 (2008) [hereinafter Key Issues].  Private health insurance accounts for more than one-third of the spending on health care, covering more than 176 million Americans.  PPACA §§ 1501(a)(2)(D), 10106(a).

As of 2008, however, more than 45 million Americans had neither private health insurance nor the protection of government programs such as Medicaid or Medicare.  See U.S. Census Bureau, Income, Poverty, and Health Insurance Coverage in the United States: 2008, at 20 (2009).  Many of the uninsured cannot afford coverage.  Others are excluded by insurers'

restrictive underwriting criteria.  Still others make the economic decision to forgo insurance, and often do not seek medical care they need.  But the uninsured do not and cannot entirely forgo use of health care services.  When accidents and illnesses inevitably occur, the uninsured still receive medical assistance, even if they cannot pay.  Indeed, "[h]ospitals that participate in Medicare and offer emergency services are required by law to stabilize any patient who arrives, regardless of" ability to pay.[1]  As Congress documented, uncompensated health care costs for the uninsured — $43 billion in 2008 — are passed on to the other participants in the health care market: the federal government, state and local governments, health care providers, insurers, and the insured population.  PPACA §§ 1501(a)(2)(F), 10106(a).

Nor is cost-shifting the only harm imposed by the uninsured.  Congress found that the "economy loses up to $207,000,000,000 a year because of the poorer health and shorter lifespan of the uninsured," id. §§ 1501(a)(2)(E), 10106(a), and concluded that 62 percent of all personal bankruptcies are caused in part by medical expenses, id. §§ 1501(a)(2)(G), 10106(a).

Congress addressed these and other problems in the American health care market by enacting the PPACA.  The 906-page Act was informed by many weeks of legislative hearings and Congressional debates, as well as extensive economic studies, legal analyses, and administrative assessments.  It builds upon existing federal programs to create a comprehensive scheme for reforming the health care market.  Recognizing that the pervasive ills in the health care system cannot be cured state by state, the Act adopts wide-ranging national solutions,

---

[1]   Key Issues, supra, at 13 (referring to the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd ("EMTALA")).  In addition, most hospitals are nonprofit organizations that have some obligation to provide care at no or minimal cost to those who cannot afford to pay.  Id.

3

including, for example, a "National Strategy to Improve Health Care Quality," id. § 3011, a "National Prevention, Health Promotion and Public Health Council," id. §§ 4001, 10401, authority for nationwide and multi-state health insurance plans, and federal programs to address geographic health care disparities.

Through its interrelated provisions, the Act seeks to reduce the number of uninsured Americans and the escalating costs they impose on the health care system.  To make health insurance affordable and available, the Act provides for "health benefit exchanges," allowing individuals and small businesses to leverage their collective buying power to obtain prices competitive with group plans.  Id. §§ 1311, 1321.  It adopts incentives for expanded group plans through employers, id. §§ 1421, 1513, affords tax credits for low-income individuals and families, id. §§ 1401-02, extends Medicaid, id. § 2001, and increases federal subsidies to state-run programs.   Id.   §§ 2001(a)(3)(B), 10201; HCERA § 1201.   It also prohibits insurance companies from denying coverage to those with pre-existing medical conditions, setting eligibility rules based on medical factors or claims experience, or rescinding coverage other than for fraud or misrepresentation.  PPACA §§ 1001, 1201.

Integral to this legislative effort to lower the cost of health insurance, expand coverage, and reduce uncompensated care is the requirement that all Americans, with specified exceptions, maintain a minimum level of health insurance coverage, or pay a penalty.  Id. §§ 1501(a)(2)(I), 1501(b), 10106(a).  Congress determined that this provision "is an essential part of this larger regulation of economic activity," and that its absence "would undercut Federal regulation of the health insurance market."  Id. §§ 1501(a)(2)(H), 10106(a).  That judgment rested on a number of Congressional findings.  First, Congress found that without the minimum coverage provision, the

4

reforms in the Act, such as the ban on denying coverage based on pre-existing conditions, would amplify existing incentives for individuals to "wait to purchase health insurance until they needed care," which in turn would shift even greater costs onto third parties.   Id. §§ 1501(a)(2)(I), 10106(a).   Conversely, Congress found that by "significantly reducing the number of the uninsured, the requirement, together with the other provisions of this Act, will lower health insurance premiums."   Id. §§ 1501(a)(2)(F), 10106(a).   Congress concluded that, as with all insurance, spreading risks across a larger pool allows insurers to charge less for coverage.   Id. §§ 1501(a)(2)(I), 10106(a).   Congress thus determined that the minimum coverage provision "is essential to creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be sold."   Id.

In the face of these findings, and despite the hundreds of billions of dollars the Act directs to transforming the multi-trillion dollar interstate market for health care, plaintiffs claim that this integral part of the Act falls outside of both Congress's authority over interstate commerce and its power to tax and spend for the general welfare.   These claims are flatly wrong. Plaintiffs' case, however, fails before the Court can even consider the lack of merit, because plaintiffs cannot establish either of the basic prerequisites — standing to challenge this provision or the irreparable harm required to justify the extraordinary remedy of a preliminary injunction. First, the minimum coverage provision does not become effective until 2014.   Id. § 1501 (adding 26 U.S.C. § 5000A(a)) ("An applicable individual shall for each month beginning after 2013 ensure that the individual . . . is covered under minimum essential coverage.").   The provision thus neither imposes obligations on plaintiffs nor exacts revenue from them before that time.

Moreover, even after that date, plaintiffs cannot show that the Act will affect them.  To be sure, plaintiffs proclaim their current intent not to obtain health insurance.  But between now and 2014, changed health circumstances or other events may lead plaintiffs voluntarily to satisfy the minimum coverage provision by buying insurance (particularly if they qualify for subsidies provided elsewhere in the Act).  They may also satisfy the provision by obtaining employment that includes a health insurance benefit.  Alternatively, even if they do not obtain insurance, plaintiffs may have insufficient income in 2014 to be liable for any penalty.  Plaintiffs might also qualify for one of the Act's exemptions covering those who "cannot afford coverage," or who would otherwise suffer hardship if required to purchase insurance.  PPACA § 1501 (adding 26 U.S.C. § 5000A(e)).  And even if plaintiffs become liable for a penalty in 2014, they specifically allege that it is an unconstitutional tax.  The Anti-Injunction Act bars a suit to enjoin collection of a tax.  Under plaintiffs' own theory, their remedy would be to pay any assessed penalties to the IRS and then sue for a refund.  Given the availability of that remedy, any harm plaintiffs might conceivably sustain would be fully reparable.

Plaintiffs likewise cannot show that they are likely to succeed on the merits.  As to the Commerce Clause, Congress specifically found that, in the interstate markets for health care and health insurance, the minimum coverage provision "regulates activity that is commercial and economic in nature:  economic and financial decisions about how and when health care is paid for, and when health insurance is purchased."  PPACA §§ 1501(a)(2)(A), 10106(a).  The predicate of this finding, and a distinguishing feature of the health care market, is that virtually everyone will need medical services at some point.  Congress had a rational basis to conclude that economic decisions not to purchase insurance to pay for these services, taken in the

aggregate, substantially affect interstate commerce by, among other things, shifting costs to third parties, id. §§ 1501(a)(2)(F), 10106(a), "increas[ing] financial risks to households and medical providers," id. §§ 1501(a)(2)(A), 10106(a), precipitating personal bankruptcies, id. §§ 1501(a)(2)(G), 10106(a), raising insurance premiums, id. §§ 1501(a)(2)(F), 10106(a), and imposing higher administrative expenses, id. § 1501(a)(2)(J), 10106(a).  Congress also rationally determined that the minimum coverage provision is essential to its comprehensive regulatory scheme for the interstate markets in health care and health insurance.  Id. §§ 1501(a)(2)(A), (H), (I), (J), 10106(a).  These findings are more than sufficient to sustain the Act as an exercise of Congress's Commerce Clause power.  See Gonzales v. Raich, 545 U.S. 1, 16-17 (2005).

Apart from its power under the Commerce Clause, Congress also has authority under its power to tax and spend to "provide for the . . . general Welfare," U.S. Const. art. I, § 8, cl. 1, to require individuals to pay a penalty — derided by plaintiffs as an "unconstitutional tax" — if they do not obtain health insurance.  The determination of what furthers the general welfare is for Congress to make, "unless the choice is clearly wrong, a display of arbitrary power, not an exercise of judgment."  Helvering v. Davis, 301 U.S. 619, 640 (1937).  The minimum coverage provision, either considered by itself or —  consistent with the manner in which courts frequently assess statutes — "with a view to [its] place in the overall statutory scheme," FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000) (citation and internal quotation marks omitted), falls squarely within Congress's "extensive" General Welfare authority.  License Tax Cases, 72 U.S. (5 Wall.) 462, 471 (1867).

Finally, the balance of equities and the public interest weigh strongly against granting preliminary relief.   While any harm to plaintiffs is speculative and, in any event, reparable, the consequences of an injunction are not.   Congress determined that the health care system in the United States is in crisis, spawning public expense and private tragedy.   After decades of failed attempts, Congress enacted comprehensive health care reform to deal with this overwhelming national problem.   The minimum coverage provision is vital to that comprehensive scheme. Enjoining it would thwart this reform and reignite the crisis that the elected branches of government acted to forestall.

## **ARGUMENT**

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."   Winter v. Natural Res. Def. Council, 129 S. Ct. 365, 376 (2008).   "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."   Id. at 374.[2]   Plaintiffs meet none of these requirements.   Preliminary injunctive relief in this case is not necessary to maintain the status quo until the court can make a final determination on the merits.   The minimum coverage provision will not go into effect, and therefore will not change the status quo, until 2014.   By that time, even if this Court were to

---

[2]   Winter, which plaintiffs do not cite, represents the Supreme Court's most recent articulation of the preliminary injunction standard.   That case clarifies that a plaintiff must establish both that "he is likely to succeed on the merits" and "likely to suffer irreparable harm" in order to obtain preliminary relief.   Winter, 129 S. Ct. at 374, 375 (emphasis added).

determine that it had jurisdiction, it almost certainly would have rendered a decision on the merits.

## I.     THIS COURT LACKS SUBJECT MATTER JURISDICTION

### A.     Plaintiffs Lack Standing Because the Minimum Coverage Provision Does Not Inflict Any Actual or Imminent Injury

Federal courts sit to decide cases and controversies, not to resolve disagreements on policy or politics.  To invoke the jurisdiction of this Court, plaintiffs must have standing to sue.  And to have standing, they must show an injury in fact.  No plaintiff can even arguably suffer injury from the minimum coverage provision until 2014 at the earliest, and it is speculative whether any will suffer injury even then.

#### 1.     Requirements for Standing

To establish standing, "the plaintiff must have suffered an injury in fact — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992) (internal citations, quotation marks, and footnote omitted).  To meet this requirement, the harm must be "palpable and distinct."  <u>Prime Media, Inc. v. City of Brentwood</u>, 485 F.3d 343, 352 (6th Cir. 2007) (internal quotation marks omitted).  "Allegations of possible future injury do not satisfy the requirements of Art. III.  A threatened injury must be certainly impending to constitute injury in fact."  <u>Whitmore v. Arkansas</u>, 495 U.S. 149, 158 (1990) (internal quotation marks omitted).  A plaintiff who "alleges only an injury at some indefinite future time" has not shown an injury in fact, particularly where "the acts necessary to make the injury happen are at least partly within the plaintiff's own control."  <u>Lujan</u>, 504 U.S. at 564 n.2.  In these situations,

"the injury [must] proceed with a high degree of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all." Id.

### 2.    Plaintiffs Cannot Show an Injury in Fact

The lead plaintiff, TMLC, describes itself as a "national, public interest law firm" that "educate[s] and defend[s] the citizens of the United States with respect to their constitutional rights and liberties." Compl. ¶¶ 10-11. But TMLC does not assert any injury to itself as an organization; rather, it "objects . . . through its members . . . to being forced to purchase health care coverage." Pls.' Br. Supp. Mot. Prelim. Inj. 3. Even assuming that, as a public interest law firm, TMLC is the type of organization that may assert associational standing, it can sue only if the members themselves have standing. See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., 528 U.S. 167, 181 (2000). The remaining plaintiffs assert that they do not have private health insurance and object "to being compelled by the federal government to purchase health care coverage." Compl. ¶¶ 13-16.[3] Their objections allegedly stem from personal choices to forgo health insurance. See DeMars Decl. ¶ 3, Hyder Decl. ¶ 3, Dkt. #7 (plaintiffs "want to retain control over [their] health care decisions"). Plaintiffs also claim they "have arranged their personal affairs such that it will be a hardship for them to have to either pay for health insurance that is not necessary or desirable or face penalties under the Act." Pls.' Br. Supp. Mot. Prelim. Inj. 3.

These allegations do not support standing in this case. Plaintiffs' brief fails to acknowledge that the minimum coverage provision will have no effect until January 1, 2014.

---

[3]  It appears from the complaint that plaintiffs Jann DeMars and Steven Hyder are members of TMLC, but that plaintiffs John Ceci and Salina Hyder are not. Compl. ¶¶ 13-16.

Even then, if plaintiffs elect not to purchase qualifying health insurance, the penalty would not be payable until the tax return for that year is due, i.e., April 2015.  This alleged injury is "too remote temporally" to support standing.  See McConnell v. FEC, 540 U.S. 93, 226 (2003) (Senator's claimed injury of desire to air advertisements five years in the future was "too remote temporally" to sustain standing), overruled in part on other grounds by Citizens United v. FEC, 130 S. Ct. 876 (2010).

Plaintiffs apparently reason that their injury is imminent because the minimum coverage provision is certain to go into effect in 2014.  This argument confuses imminence with certainty and, more fundamentally, mistakenly assumes that a provision certain to take effect is thereby certain to cause injury.  See Shain v. Veneman, 376 F.3d 815, 818 (8th Cir. 2004) ("[Plaintiffs] reason . . . a flood will certainly occur, albeit potentially many years from now. . . .  [But] the plaintiffs must establish they will suffer the imminent injury. . . . [T]he possibility the flood will occur while they own or occupy the land becomes a matter of sheer speculation.").

Here, it is also "a matter of sheer speculation" that plaintiffs will be injured by the minimum coverage provision in 2014 or 2015.  Personal situations can change dramatically over four years.  For example, plaintiffs might satisfy the minimum coverage provision by finding employment in which they receive health insurance as a benefit.  Or they might get insurance by qualifying for Medicaid.  They also could contract a serious illness requiring expensive medical treatments and then decide to purchase a policy.[4]  As events unfold, moreover, plaintiffs might qualify for one of the Act's exemptions covering those who "cannot afford coverage," or who

---

[4]   Plaintiffs do not object to health care or insurance generally, see Pls.' Br. Supp. Mot. Prelim. Inj. 7.

would suffer financial hardship if required to purchase insurance.  PPACA § 1501 (adding 26 U.S.C. § 5000A(e)).  And despite their protestations, it is possible that upon reviewing the yet-to-be-created menu of insurance plans, plaintiffs will find that one or more provides adequate "control over [their] health care decisions," DeMars Decl. ¶ 3, Hyder Decl. ¶ 3, Dkt. #7, leading plaintiffs to buy insurance, particularly if they qualify for the subsidies provided by the Act.

If none of these eventualities occurs and plaintiffs, come 2014, have not satisfied the minimum coverage provision and choose not to purchase health insurance, they can pay the resulting penalty and challenge the provision in a suit for a refund.  As of now, however, any harm that plaintiffs might suffer is remote rather than imminent, speculative rather than concrete, and "at least partly within [their] own control."  Lujan, 504 U.S. at 564 n.2.  Courts find no standing in such situations.  See, e.g., Rosen v. Tenn. Comm'r of Fin. & Admin., 288 F.3d 918, 929 (6th Cir. 2002) (rejecting plaintiffs' argument that "[s]ince they . . . will potentially be affected by [the statute] in the future, . . . they ha[d] the requisite personal stake in its implementation now").

Plaintiffs cannot transmute the speculative possibility of future injury into current concrete harm by asserting that they must "reorganize their affairs and essentially change the way they presently live to meet the government's demands."  Pls.' Br. Supp. Mot. Prelim. Inj. 3, 18; DeMars Decl. ¶ 5; Hyder Decl. ¶ 5.  Such reasoning would render the standing requirement meaningless.  A plaintiff could manufacture standing by asserting a current need to prepare for the most remote and ill-defined harms.  Even if such manipulation were not so transparent, plaintiffs still would "bear[] the burden of demonstrating standing and [pleading] its components with specificity."  Wuliger v. Mfrs. Life Ins. Co., 567 F.3d 787, 793 (6th Cir. 2009) (citation and

internal quotation marks omitted) (emphasis added).  Plaintiffs do not explain how the minimum

coverage provision is forcing them to "reorganize their affairs" four years before it will take

effect.  Their "'naked assertion[s]' devoid of 'further factual enhancement'" do not suffice to

show an actual, imminent injury.  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell

Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007)) (alteration in original).

Moreover, even if plaintiffs were currently taking some action in anticipation of the

minimum coverage provision, this action is not fairly traceable to the PPACA.  See Lujan, 504

U.S. at 560.  A plaintiff's alleged injury is not "fairly traceable" to a challenged provision if, as

here, that injury "stems not from the operation of [the provision] but from [his] own . . . personal

choice."  McConnell v. FEC, 540 U.S. at 228; see also Nat'l Family Planning & Reprod. Health

Ass'n v. Gonzales, 468 F.3d 826, 831 (D.C. Cir. 2006).  If plaintiffs take action now, that is a

matter of personal choice.  The minimum coverage provision does not require them to do so.

The motion for a preliminary injunction should thus be denied for lack of standing.

### B.      Plaintiffs' Claims Are Unripe

For similar reasons, plaintiffs' challenge to the minimum coverage provision is not ripe

for review.  The ripeness inquiry "evaluate[s] both the fitness of the issues for judicial decision

and the hardship to the parties of withholding court consideration."  Abbott Labs. v. Gardner,

387 U.S. 136, 149 (1967).  Plaintiffs' challenge satisfies neither prong of the ripeness inquiry

because no injury could occur before 2014, and plaintiffs have not shown that one will occur

even then.  See Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 580-81 (1985) (claim

is not ripe if it rests upon "contingent future events that may not occur as anticipated, or indeed

may not occur at all" (citation and internal quotation marks omitted)); Grand Lodge of Fraternal

13

Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 17-18 (D.D.C. 2001) ("[W]ith respect to the 'hardship to the parties' prong, an abstract harm is not sufficient; there must be an immediate harm with a 'direct effect on the day-to-day business of the plaintiffs.'") (quoting Texas v. United States, 523 U.S. 296, 301 (1998)).

To be sure, "[w]here the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect." Blanchette v. Conn. Gen. Ins. Corp., 419 U.S. 102, 143 (1974). However, as explained supra at 12-13, in contrast to Blanchette, any injury to plaintiffs here is far from "inevitabl[e]." Nor is this a case like Abbott Laboratories, where the plaintiffs demonstrated "a direct effect on [their] day-to-day business." Abbott Labs., 387 U.S. at 152. This case instead involves "contingent future events that may not occur as anticipated, or indeed may not occur at all." Thomas, 473 U.S. at 580-81. Even where the issue presented is "a purely legal question," Toilet Goods Ass'n v. Gardner, 387 U.S. 158, 163 (1967), such uncertainty whether a statutory provision will harm the plaintiffs renders the controversy not ripe for review. Id. at 163-64.

### C.   The Anti-Injunction Act Bars Plaintiffs' Claims

Even if plaintiffs had an injury in fact and presented a ripe claim, the Anti-Injunction Act, 26 U.S.C. § 7421(a) ("AIA"), would bar their claim for relief. Plaintiffs specifically allege that the penalty under the minimum coverage provision is an unconstitutional tax, Compl. ¶¶ 6, 51-53, and they seek to restrain its assessment and collection. Plaintiffs' claims by their terms thus fall within the scope of the AIA, which provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or

14

not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421(a).

Even if plaintiffs did not so explicitly lodge their claims within the purview of the AIA, the AIA would still bar the relief they seek. Whether or not the penalty here is labeled a tax, it is, with exceptions not material, "assessed and collected in the same manner" as other penalties under the Internal Revenue Code, 26 U.S.C. § 5000A(g)(1), and, like these other penalties, it falls within the bar of the AIA. 26 U.S.C. § 6671(a); see, e.g., Barr v. United States, 736 F.2d 1134, 1135 (7th Cir. 1984) (per curiam) ("Section 6671 provides that the penalty at issue here is a tax for purposes of the Anti-Injunction Act."). That result is consistent with the purpose of the AIA, to preserve the Government's ability to collect such assessments expeditiously with "a minimum of preenforcement judicial interference" and "to require that the legal right to the disputed sums be determined in a suit for refund." Bob Jones Univ. v. Simon, 416 U.S. 725, 736 (1974) (citation and internal quotation marks omitted).

Under the AIA, as well as the Declaratory Judgment Act,[5] district courts lack jurisdiction to order the abatement of any such liability under the Internal Revenue Code except in validly-filed claims for refund. See Bartley v. United States, 123 F.3d 466, 467 (7th Cir. 1997). These jurisdictional limitations apply even where, as here, plaintiffs raise a constitutional challenge to a statute that imposes a penalty:

> The "decisions of this Court make it unmistakably clear that the constitutional nature of a taxpayer's claim . . . is of no consequence" to whether the prohibition against tax injunctions applies. This is so even though the Anti-Injunction Act's

---

[5]   The Declaratory Judgment Act, 28 U.S.C. § 2201(a), similarly provides district courts jurisdiction to grant declaratory relief "except with respect to Federal taxes." As the Supreme Court noted in Bob Jones University, the tax exception to the Declaratory Judgment Act demonstrates the "congressional antipathy for premature interference with the assessment or collection of any federal tax." 416 U.S. at 732 n.7.

prohibitions impose upon the wronged taxpayer requirements at least as onerous as those mandated by the refund scheme — the taxpayer must succumb to an unconstitutional tax, and seek recourse only after it has been unlawfully exacted.

United States v. Clintwood Elkhorn Mining Co., 553 U.S. 1, 10 (2008) (quoting Alexander v. "Americans United" Inc., 416 U.S. 752, 759 (1974) (omission in original)).

The Anti-Injunction Act therefore bars plaintiffs' effort to enjoin collection of the minimum coverage penalty.

## II.   PLAINTIFFS HAVE NOT SHOWN THAT THEY ARE LIKELY TO SUFFER IRREPARABLE HARM IF THE PRELIMINARY INJUNCTION IS DENIED

Even if this Court had subject matter jurisdiction, preliminary relief would be unavailable because plaintiffs cannot demonstrate irreparable injury, an essential element plaintiffs must establish to obtain the extraordinary remedy they seek. See Sampson v. Murray, 415 U.S. 61, 88 (1974) ("'[T]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.'" (quoting Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506-07 (1959)). The "purpose of a preliminary injunction is . . . to preserve the status quo." United States v. Edward Rose & Sons, 384 F.3d 258, 261 (6th Cir. 2004). But here, the status quo will not change in the absence of preliminary relief, and this Court will have ample time to render a final decision before plaintiffs could suffer any harm.

Plaintiffs' conclusory allegations regarding the need to "reorganize their affairs" cannot manufacture irreparable harm. See Gov't Suppliers Consolidating Servs. v. Bayh, 734 F. Supp. 853, 863 (S.D. Ind. 1990) ("Even if the plaintiffs are currently planning (or being prevented from planning) 1991 shipments of solid waste into the state, there has been absolutely no showing that the plaintiffs cannot simply postpone this planning until this court can render a decision on the

16

merits.").[6]  And if plaintiffs could somehow conjure up some immediate harm, their claimed injury — that they will be required either to purchase health insurance or to pay a penalty — is economic and thus not irreparable.  Sampson, 415 U.S. at 90 ("[T]he temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury."); Manakee Prof'l Med. Transfer Serv. v. Shalala, 71 F.3d 574, 581 (6th Cir. 1995) (recoverable "monetary damages do not generally constitute irreparable harm").   Plaintiffs' assertion that sovereign immunity precludes later monetary relief from the United States, Pls.' Br. Supp. Mot. Prelim. Inj. 18, is incorrect.  To the contrary, if plaintiffs choose not to obtain minimum coverage and incur the penalty, they can follow the procedures prescribed by law and sue for a refund, without the bar of sovereign immunity.  See 26 U.S.C. § 7422.  The availability of a refund suit constitutes an adequate remedy at law.  Bob Jones Univ., 416 U.S. at 746.[7]

---

[6]  Even if plaintiffs did somehow need four years to plan ahead, "a preliminary injunction . . . will do nothing to remedy the plaintiffs' [alleged] injuries. They must still make a . . . decision today that ultimately depends not on the outcome of their motion for a preliminary injunction but on the outcome of [a decision] on the merits. In other words, [a] decision on the preliminary injunction does not guarantee plaintiffs that come January [2014, the PPACA would not go into effect]."  Gov't Suppliers, 734 F. Supp. at 863.

[7]  Plaintiffs also misstate the law in claiming that "when an alleged violation of the Constitution is involved, most courts do not require a further showing of irreparable injury."  Pls.' Br. Supp. Mot. Prelim. Inj. 18.  A plaintiff cannot bypass the requirement of showing irreparable harm simply by mounting a constitutional challenge.  A federal court has "no power per se to review and annul acts of Congress on the ground that they are unconstitutional. . . .  The party who invokes the power must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement."  Hein v. Freedom from Religion Found., 551 U.S. 587, 599 (2007) (quoting Frothingham v. Mellon, 262 U.S. 447, 488 (1923) (omission in original)).
    The cases plaintiffs cite do not excuse this burden.  In Government Suppliers, for example, the court refused to find irreparable harm based on a statutory provision that had not yet gone into effect.  734 F. Supp. at 862-63.  The other cases plaintiffs cite merely find some actual and imminent constitutional injuries irreparable.  They do not deem a showing of injury unnecessary.  See Elrod v. Burns, 427 U.S. 347, 373 (1976); Citicorp Servs., Inc. v. Gillespie,

17

## III.   PLAINTIFFS CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiffs' constitutional challenge to the minimum coverage provision also is unlikely to succeed on the merits.  "'[D]ue respect for the decisions of a coordinate branch of Government demands that [this Court] invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds.'"  United States v. Suarez, 263 F.3d 468, 476 (6th Cir. 2001) (quoting United States v. Morrison, 529 U.S. 598, 607 (2000)).  The minimum coverage provision falls within the bounds of Congress's power to regulate interstate commerce and, independently, its power to tax and spend for the general welfare.[8]

### A.   The Minimum Coverage Provision Is a Valid Exercise of Congress's Power to Regulate Interstate Commerce.

The Constitution grants Congress the authority to "regulate Commerce . . . among the several States," U.S. Const. art. I, § 8, cl. 3, and to "make all Laws which shall be necessary and proper" to the execution of that power, id. cl. 18.  This broad grant of power is not limited to the direct regulation of interstate commerce.   Congress also may "regulate activities that substantially affect interstate commerce," Raich, 545 U.S. at 17, or that form part of a "larger regulation of economic activity."   Id. at 24 (citation and internal quotation marks omitted).  "When Congress decides that the total incidence of a practice poses a threat to a national market, it may regulate the entire class."   Id. at 17 (internal quotation marks omitted).  Moreover, when "'a general regulatory statute bears a substantial relation to commerce, the de minimis character

712 F. Supp. 749, 753 (N.D. Cal. 1989); C & A Carbone, Inc. v. Town of Clarkstown, 770 F. Supp. 848, 854 (S.D.N.Y. 1991).

[8]   Although their complaint raises other challenges to the Act, plaintiffs have not relied on those provisions to justify their request for preliminary relief.   See Pls.' Br. Supp. Mot. Prelim. Inj. 1 n.2.

of individual instances arising under that statute is of no consequence.'" Id. (quoting United States v. Lopez, 514 U.S. 549, 558 (1995)). "[W]here the class of activities is regulated and that class is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class." Id. at 23 (internal quotation marks omitted).

"In assessing the scope of Congress' authority under the Commerce Clause," the Court's task "is a modest one." Raich, 545 U.S. at 22. The Court need not itself determine whether the regulated activities, "taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." Id. Under this deferential rational basis review, a court may not second-guess the factual record upon which Congress relied.

The Supreme Court's decisions in Raich and Wickard v. Filburn, 317 U.S. 111 (1942), illustrate the breadth of the Commerce power and the deference accorded Congress's judgments. In Raich, the Court sustained Congress's authority to prohibit the possession of home-grown marijuana intended solely for personal use; it was sufficient that the Controlled Substances Act "regulates the production, distribution, and consumption of commodities for which there is an established, and lucrative, interstate market." Raich, 545 U.S. at 26. Similarly, in Wickard, the Court upheld a penalty on wheat grown for home consumption despite the farmer's protests that he did not intend to put the commodity on the market. It was sufficient that the existence of homegrown wheat, in the aggregate, could "suppl[y] a need of the man who grew it which would otherwise be reflected by purchases in the open market," thus undermining the efficacy of the federal price stabilization scheme. Wickard, 317 U.S. at 128. Thus, in each case, the Court sustained Congress's power to impose obligations even on individuals who claimed not to participate in interstate commerce, because those obligations were components of broad schemes

19

regulating interstate commerce.

Raich came after the Court's decisions in Lopez and Morrison, and thus it highlights the central focus and outer boundaries of those cases. Unlike Raich, the Supreme Court concluded that neither Lopez nor Morrison involved regulation of economic activity. And neither case, according to the Court, addressed a measure that was integral to a comprehensive scheme to regulate activities in interstate commerce. Lopez was a challenge to the Gun-Free School Zones Act of 1990, "a brief, single-subject statute making it a crime for an individual to possess a gun in a school zone." Raich, 545 U.S. at 23. The Court concluded that possessing a gun in a school zone is not an economic activity. Nor, the Court held, was the prohibition against possessing a gun "'an essential part[] of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated.'" Id. at 24-25 (quoting Lopez, 514 U.S. at 561). Indeed, the argument that this provision affected interstate commerce had to posit an extended chain of causation – guns near schools lead to violent crime; such violent crime imposes costs; and insurance spreads those costs. The Court found this reasoning too attenuated to sustain the gun law "'under [the Court's] cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce.'" Id. at 24 (quoting Lopez, 514 U.S. at 561). Likewise, the provision at issue in Morrison simply created a civil remedy for victims of gender-motivated violent crimes. Id. at 25. The Court held that gender-motivated violent crimes, too, are not an economic activity, and emphasized that the statute at issue focused on violence against women, not on any broader regulation of economic activity.

Here, the statute regulates a broader – indeed, massive – interstate market in health care

services.  On the basis of detailed findings, which were the product of extensive hearings and debate, the provision at issue addresses cost-shifting in those markets, quintessentially economic activity, and it operates as an essential part of a comprehensive, intricately interrelated regulatory scheme.  The provision thus falls well within Congress's established Commerce Clause powers.

1.   **The Minimum Coverage Provision Prevents Cost-Shifting in the Health Care Market, and Therefore Regulates Economic Activities That Substantially Affect Interstate Commerce**

As explained above, by providing that individuals must maintain a minimum level of coverage or pay a penalty, the minimum coverage provision counters existing economic incentives to delay or forgo insurance and thus reduces the costs that the uninsured shift onto other participants in the health care market.  This provision is within Congress's power under the Commerce Clause.  Choices about how to pay for goods and services in that health care market are quintessential economic decisions that, in light of their aggregate effects, are within the traditional scope of Commerce Clause regulation.   In its thorough and meticulous findings, Congress expressly recognized that "decisions about how and when health care is paid for, and when health insurance is purchased" are "economic and financial" and therefore "commercial and economic in nature."  PPACA §§ 1501(a)(2)(A), 10106(a).

Congress needed no extended chain of inferences to determine that individual decisions to forgo insurance coverage, in the aggregate, substantially affect interstate commerce by shifting costs to health care providers and the public.  As noted earlier, individuals who do not carry insurance are nonetheless participants in the health care market, and those uninsured often "receive treatments from traditional providers for which they either do not pay or pay very little, which is known as 'uncompensated care.'"  Key Issues, supra, at 13.  Congress found that the

21

cost of providing uncompensated care to the uninsured was $43 billion in 2008.   PPACA §§ 1501(a)(2)(F), 10106(a).   The cost not defrayed by the federal government falls in the first instance on health care providers, Council of Economic Advisers, Economic Report of the President 187 (2010), and then is passed on to private insurers, which then pass on the cost to families, effectively creating a "hidden tax" on premiums.  Id.  These direct and aggregate effects are sufficient to ground authority under the Commerce Clause.  Raich, 545 U.S. at 16-17; Wickard, 317 U.S. at 128.  And that is all the more so because the individual decision to forgo health insurance is made against the background of federal requirements and programs that themselves create the framework allowing the uninsured to transfer many of their health care costs to health care providers, insurers, governments, and insured individuals.[9]

Plaintiffs' claim that individuals who forgo health insurance are not engaged in any economic "activity," Pls.' Br. Supp. Mot. Prelim. Inj. 15-16, is fallacious.  Some individuals make what Congress found is an "economic and financial decision" to try to pay for health care services without reliance on insurance.  PPACA §§ 1501(a)(2)(A), 10106(a).  Indeed, plaintiffs here concede that they intend to "pay for health care services as [they] need them."  DeMars Decl. ¶ 3, Hyder Decl. ¶ 3.  Plaintiffs thus have not opted out of health care; they are not passive bystanders divorced from the health care market.  They have made a choice regarding the method of payment for the services they expect to receive, no less "active" than a decision to pay by credit card rather than by check.   Congress specifically focused on those who had such an

---

[9]  See supra note 1 (describing EMTALA); see also Key Issues, supra, at 13-14; 155 Cong. Rec. H8002-8003 (July 10, 2009) (statement of Rep. Broun, citing cost-shifting by the uninsured); 155 Cong. Rec. H6608 (June 11, 2009) (statement of Rep. Murphy, same); 155 Cong. Rec. H4771 (April 27, 2009) (statement of Rep. Fleming, same).

economic choice, exempting certain persons who cannot purchase health insurance for religious reasons, as well as those who had no options — who could not afford insurance, or who would suffer financial hardship if required to purchase it.   And Congress found that this class of volitional economic decisions, taken in the aggregate, results each year in billions of dollars in uncompensated health care costs that are passed on to governments and other third parties, because many who choose not to purchase health care eventually receive health care services they cannot afford.   Plaintiffs' attempt to characterize those economic decisions as "inactivity" cannot obscure that they have a direct and substantial effect on the interstate health care market in which the uninsured participate.   Those economic decisions thus are subject to federal regulation.

In any event, the Supreme Court has consistently rejected claims that individuals who choose not to engage in commerce thereby place themselves beyond the reach of the Commerce Clause power.   See, e.g., Raich, 545 U.S. at 30 (rejecting the argument that plaintiffs' home-grown marijuana was "entirely separated from the market"); Wickard, 317 U.S. at 127, 128 (reasoning that home-grown wheat "competes with wheat in commerce" and "may forestall resort to the market");  Heart of Atlanta Motel v. United States, 379 U.S. 241 (1964) (Commerce Clause allows Congress to regulate decisions not to engage in transactions with persons with whom plaintiff did not wish to deal); Daniel v. Paul, 395 U.S. 298 (1969) (same).  The question, again, is whether plaintiffs' economic decisions have a substantial effect on the larger market for health care services.   Here Congress reasonably concluded that they do, and that empowers Congress to regulate.

2. **The Minimum Coverage Provision Is an Essential Part of the Act's Broader Regulatory Scheme**

The minimum coverage provision is also justified independently under the Commerce Clause as an essential part of the comprehensive regulatory scheme effectuated in the Act. The discussion above outlines the vast scope of the health care market, the existing federal regulation of health insurance, and the intersecting components of the Act designed to address national health care issues on a national basis.[10]   As explained above, the Act increases the availability and affordability of health insurance by prohibiting an array of insurance industry practices that deny coverage or increase premiums for those with the greatest health care needs. By 2014, the Act will bar insurers from refusing to cover individuals with pre-existing medical conditions, and from setting eligibility rules based on health status, medical condition, claims experience, or medical history. PPACA § 1201. Plaintiffs do not and cannot contend that these provisions, which directly regulate the content of insurance sold nationwide, are outside the scope of the Commerce Clause power. See also South-Eastern Underwriters Ass'n, 322 U.S. at 553.[11]

---

[10]   States lack the ability to address these pressing national issues on a piecemeal basis. The success of any state's efforts turns in large part on the success of the efforts of its neighboring states, as well as the success of Congress in addressing uniquely national issues. Thus, "[e]xpecting states to address the many vexing health policy issues on their own is unrealistic, and constrains the number of states that can even make such an effort." State Coverage Initiatives: Hearing before the Subcomm. on Health of the H. Comm. on Ways and Means, 110th Cong. 7 (2008) (testimony of Alan R. Weil, Exec. Dir., National Academy of State Health Policy); see also id. at 16 (testimony of John C. Lewin, CEO, American College of Cardiology); id. at 28 (statement of Trish Riley, Director, Maine Governor's Office of Health Policy and Finance).

[11]   Indeed, Congress has long regulated health insurance. In 1974, Congress enacted the Employee Retirement and Income Security Act, Pub L. No. 93-406, 88 Stat. 829 ("ERISA"), which establishes federal requirements for health insurance plans offered by private employers.

Congress found that, absent the minimum coverage provision, these new regulations would encourage more individuals to forgo insurance, thereby aggravating current problems with cost-shifting and increasing insurance prices.   That is, given the Act's denial-of-coverage prohibitions directed at the insurance industry, more individuals might "make an economic and financial decision to forego health insurance coverage," PPACA §§ 1501(a)(2)(A), 10106(a), until their medical situation becomes dire.   Such individual decisions multiplied thousands — if not millions — of times, would result in a system in which only the sickest in our society tend to carry health insurance.   Where the <u>most</u> expensive are in the insurance system, and the <u>least</u> expensive are outside it, insurance prices skyrocket and cost-shifting is magnified.   Those who obtain medical insurance end up paying not only for themselves, but also for others who do not

---

A decade later, Congress passed the Consolidated Omnibus Budget Reconciliation Act of 1985, Pub. L. No. 99-272, 100 Stat. 82 ("COBRA"), which allows workers and their families who lose their health benefits under certain circumstances the right to continue receiving certain benefits from their group health plans for a time.   In 1996, Congress enacted the Health Insurance Portability and Accountability Act, Pub. L. No. 104-191, 110 Stat. 1936 ("HIPAA"), to improve access to health insurance by, among other things, generally prohibiting group plans from discriminating against individual participants and beneficiaries based on health status, requiring insurers to offer coverage to small businesses, and limiting the pre-existing condition exclusion period for group plans.   26 U.S.C. §§ 9301, 9302, 29 U.S.C. §§ 1181(a); 1182, 42 U.S.C. §§ 300gg, 300gg-1.   HIPAA added similar requirements for individual insurance coverage to the Public Health Service Act.   Pub. L. No. 104-191, § 111, 110 Stat. 1979.   <u>See also</u> Mental Health Parity Act of 1996, Pub. L. No. 104-204, 110 Stat. 2944 (regulating annual or lifetime dollar limits on mental health benefits); Newborns' and Mothers' Health Protection Act of 1996, Pub. L. No. 104-204, 110 Stat. 2935 (requiring plans that offer maternity coverage to provide at least a 48-hour hospital stay following childbirth); Women's Health and Cancer Rights Act of 1998, Pub. L. No. 105-277, 112 Stat. 2681 (requiring certain plans to offer benefits related to mastectomies).   More recently, Congress passed the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008, Pub. L. No. 110-343, 122 Stat. 3765 ("MHPAEA"), requiring parity in financial requirements and treatment limitations for mental health benefits and medical and surgical benefits.   MHPAEA §§ 701, 702.   The PPACA builds on these laws regulating health insurance.

25

have insurance, who cannot pay out of pocket, and who end up accessing the health care system. To avoid these counterproductive effects, Congress found, the minimum coverage provision is "essential" to the broader regulatory scheme.   Id. §§ 1501(a)(2)(J), 10106(a); see id. §§ 1501(a)(2)(I), 10106(a) (explaining that provisions encouraging healthy individuals to purchase insurance are "essential to creating effective health insurance markets");   Health Reform in the 21st Century: Insurance Market Reforms: Hearing before the H. Comm. on Ways and Means, 111th Cong. 13 (2009) (testimony of Uwe Reinhardt, Ph.D) (imposing these reforms on a market of competing private health insurers without broadening the risk pool to include healthy individuals would "inexorably drive that market into extinction").[12]

However they label their economic decision that they are personally better off paying for health care services without resort to insurance, plaintiffs again cannot obscure the dispositive point — Congress rationally determined that the minimum coverage provision is critical to the comprehensive regulation of health insurance.  That, under Raich, places the provision within Congress's Commerce Clause authority.   Raich, 545 U.S. at 22.   Indeed, Justice Scalia emphasized in Raich that under the Necessary and Proper Clause, "Congress may regulate even noneconomic local activity if that regulation is a necessary part of a more general regulation of interstate commerce."   Raich, 545 U.S. at 37 (Scalia, J., concurring).   "The relevant question is

---

[12]  Congress explained:  "By significantly increasing health insurance coverage and the size of purchasing pools, which will increase economies of scale, the requirement, together with the other provisions of this Act, will significantly reduce administrative costs and lower health insurance premiums," and is therefore "essential to creating effective health insurance markets that do not require underwriting and eliminate its associated administrative costs."   PPACA §§ 1501(a)(2)(J), 10106(a).

simply whether the means chosen are 'reasonably adapted' to the attainment of a legitimate end under the commerce power."  Id. (quoting <u>United States v. Darby</u>, 312 U.S. 100, 121 (1941)); <u>see also</u> <u>Sabri v. United States</u>, 541 U.S. 600, 605 (2004) (stressing that <u>M'Culloch v. Maryland</u>, 4 Wheat. 316 (1819), established "review for means-ends rationality under the Necessary and Proper Clause").  The minimum coverage provision — addressing economic decisions regarding services that everyone inevitably will need — is a reasonable means of effectuating Congress's goal.

**B.      The Minimum Coverage Provision Is Constitutional as an Exercise of the Power to Tax and Spend to Provide for the General Welfare**

Plaintiffs' challenge to the minimum coverage provision of the Act fails on the merits for a second reason.  Independent of its Commerce Clause authority, Congress holds the "Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."  U.S. Const. art. I, § 8, cl. 1.  Subject to nominal constraints concerning the allocation of particular types of taxes, the Supreme Court has long held that this power is "extensive."  <u>License Tax Cases</u>, 72 U.S. (5 Wall.) 462, 471 (1867); <u>see, e.g.</u>, <u>McCray v. United States</u>, 195 U.S. 27, 56-59 (1904); <u>United States v. Doremus</u>, 249 U.S. 86, 93 (1919).  Congress may use its taxing power even for purposes that would exceed its powers under the Commerce Clause or under other provisions of Article I.  <u>See</u> <u>United States v. Sanchez</u>, 340 U.S. 42, 44 (1950) ("Nor does a tax statute necessarily fall because it touches on activities which Congress might not otherwise regulate."); <u>see also</u> <u>United States v. Butler</u>, 297 U.S. 1, 66 (1936).  As suggested by the text of Article I, Section 8, Clause 1, the principal

27

limitation on the taxing power is that the use at issue "provide for . . . the general Welfare."  But the choice of methods to pursue the general welfare belongs to Congress, not to the courts.  See South Dakota v. Dole, 483 U.S. 203, 207 (1987); Helvering v. Davis, 301 U.S. 619, 640 (1937); see also Cutter v. Wilkinson, 423 F.3d 579, 585 (6th Cir. 2005).

The minimum coverage provision falls within Congress's "extensive" General Welfare authority, see License Tax Cases, 72 U.S. (5 Wall.) at 471.  The Act requires individuals not otherwise exempt to obtain "minimum essential coverage" or pay a penalty for the failure to do so.  PPACA § 1501 (adding 26 U.S.C. § 5000A(a), (b)(1)).  Individuals who are not required to file income tax returns for a given year are not subject to this provision.  Id. § 1501 (adding 26 U.S.C. § 5000A(e)(2)).  In general, the penalty is calculated as the greater of a fixed amount or a percentage of the taxpayer's household income, but cannot exceed the national average premium for the least comprehensive plans offered through health insurance exchanges for the taxpayer's family size.  Id. § 1501 (adding 26 U.S.C. § 5000A(c)(1), (2)).  If the penalty applies, the individual must report it on his return for the taxable year.  Id. § 1501 (adding 26 U.S.C. § 5000A(b)(2)).  The penalty is assessed and collected in the same manner as other penalties imposed under the Internal Revenue Code.[13]

That the provision has a regulatory purpose does not place it beyond Congress's taxing power.[14]  Sanchez, 340 U.S. at 44 ("It is beyond serious question that a tax does not cease to be

---

[13]  The Secretary of the Treasury may not collect the penalty by means of liens or levies, and may not bring a criminal prosecution for failure to pay the penalty.  Id. § 1501 (adding 26 U.S.C. § 5000A(g)(2)).  The revenues derived from the minimum coverage penalty are paid into general revenues.

[14]  Congress has long used the taxing power as a regulatory tool, and in particular as a tool to

28

valid merely because it regulates, discourages, or even definitely deters the activities taxed."); see also United States v. Kahriger, 345 U.S. 22, 27-28 (1953), overruled in part on other grounds by Marchetti v. United States, 390 U.S. 39 (1968); cf. Bob Jones Univ., 416 U.S. at 741 n.12 (noting that the Court has "abandoned" older "distinctions between regulatory and revenue-raising taxes"). So long as a statute is "productive of some revenue," the courts will not second-guess Congress's exercise of its taxing powers, and "will not undertake, by collateral inquiry as to the measure of the regulatory effect of a tax, to ascribe to Congress an attempt, under the guise of taxation, to exercise another power denied by the Federal Constitution." Sonzinsky v. United States, 300 U.S. 506, 514 (1937); see also United States v. Thompson, 361 F.3d 918, 922 (6th Cir. 2004) (upholding exercise of taxing power for statute that was not "utterly devoid of a taxing purpose"); United States v. Birmley, 529 F.2d 103, 106 (6th Cir. 1976). The minimum coverage provision will produce about $4 billion in annual revenue once it is fully in effect. Letter from Douglas W. Elmendorf, Director, CBO, to the Hon. Nancy Pelosi, Speaker, U.S. House of Representatives tbl. 4 at 2 (Mar. 20, 2010) [hereinafter CBO Letter]. Thus, the provision produces revenue, alongside its regulatory purpose, which is all that Article I, Section 8, Clause 1 requires.[15]

---

regulate how care is paid for in the national health care market. HIPAA, for example, limits the ability of group health plans to exclude or terminate applicants with pre-existing conditions, and imposes a tax on any such plan that fails to comply with these requirements. 26 U.S.C. §§ 4980D, 9801-03. In addition, the Internal Revenue Code requires group health plans to offer COBRA continuing coverage to terminated employees, and similarly imposes a tax on any plan that fails to comply with this mandate. 26 U.S.C. § 4980B.

[15] Plaintiffs' complaint alleges that the Government may not rely on the taxing power because, if the minimum coverage provision is a tax, it is a "capitation tax" which must be apportioned

In any event, just as a court should interpret the "words of a statute . . . in their context and with a view to their place in the overall statutory scheme," <u>FDA v. Brown & Williamson Tobacco Corp.</u>, 529 U.S. 120, 133 (2000) (citation and internal quotation marks omitted), so, too, the court should analyze the purpose and function of statutory provision in context, as an integral part of the overall statutory scheme it advances.  Here, in order to expand insurance coverage, Congress, among other things, enacted tax credits for individuals and employers as well as tax penalties for certain employers that do not offer insurance, offered subsidies to low income households to purchase insurance from the health benefit exchanges, broadened eligibility for Medicaid and authorized significant federal expenditures to cover the increased costs of that expansion, and made additional tax assessments on pharmaceutical and medical device manufacturers, as well as insurance companies, to help finance the additional coverage.  In determining the budgetary impact of the legislation, the CBO examined the combined,

among the states under Article I, Section 9.  Compl. ¶ 47.  To begin with, the Supreme Court has <u>never</u> struck down a tax on the ground it was a "capitation tax," and the last case to strike down a tax as direct (<u>Pollock v. Farmers' Loan & Trust Co.</u>, 158 U.S. 601 (1895)) was overruled by the Sixteenth Amendment. In any event, a capitation (or poll, or head) tax is one imposed "simply, without regard to property, profession, or any other circumstance."  <u>Hylton v. United States</u>, 3 U.S. (3 Dall.) 171, 175 (1796) (opinion of Chase, J.); <u>see also</u> <u>Pac. Ins. Co. v. Soule</u>, 74 U.S. (7 Wall.) 433, 444 (1868).  A tax imposed on the occurrence of an event has always been understood to be an indirect tax not subject to Article I, Section 9.  <u>United States v. Mfrs. Nat'l Bank of Detroit</u>, 363 U.S. 194, 197-98 (1960); <u>Tyler v. United States</u>, 281 U.S. 497, 502 (1930). The minimum coverage provision's penalty is not an indiscriminate head tax, but turns on a particular event: the penalty is assessed on a monthly interval, based on an individual's election of how to pay for health care services.  Its application also turns on an individual's income.  <u>See</u> U.S. Const. amend. XVI.  The provision excuses persons with incomes below the tax filing threshold.  It also exempts those for whom the cost of coverage exceeds eight percent of household income.  And any payment required varies with income, subject to a cap equal to the cost of qualifying coverage.  PPACA § 1501(b) (adding 26 U.S.C. § 5000A(c)(1)-(2), (e)(1)-(2)). Accordingly, even if plaintiffs could revive the "capitation tax" doctrine from its long desuetude, it would not apply here.

interconnected effects of all these provisions.  See CBO Letter, supra, at 2-6 & tbl.1, tbl.2.

Congress reasonably concluded that the minimum coverage provision would increase the number of persons with insurance, permit the restrictions imposed on insurers to function efficiently, and lower insurance premiums.  See PPACA §§ 1502(a), 10106(a).  And Congress determined, also with substantial reason, that this provision was essential to the success of its comprehensive scheme of reform.  Congress acted well within its prerogatives under the General Welfare Clause to include the minimum coverage provision as an integrated component of the interrelated revenue and spending provisions in the Act, and as a measure necessary and proper to the overall goal of advancing the general welfare.  See, e.g., Buckley v. Valeo, 424 U.S. 1, 90 (1976) (grant of power under the General Welfare Clause "is quite expansive, particularly in view of the enlargement of power by the Necessary and Proper Clause").

## IV.    THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST WEIGH STRONGLY AGAINST GRANTING PRELIMINARY RELIEF

Plaintiffs cannot establish that either the balance of equities or the public interest weighs in their favor.  The Supreme Court has cautioned that "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982).  "In cases involving the public interest as defined or protected by an Act of Congress, courts have long held that equitable discretion 'must be exercised in light of the large objectives of the Act.  For the standards of the public interest not the requirements of private litigation measure the propriety and need for injunctive relief in these cases.'"  United States v. Miami Univ., 294 F.3d 797, 818-19 (6th Cir.

31

2002) (quoting <u>Hecht Co. v. Bowles</u>, 321 U.S. 321, 331 (1944)).  Indeed, "a court sitting in equity cannot ignore the judgment of Congress, deliberately expressed in legislation."  <u>United States v. Oakland Cannabis Buyers' Co-op.</u>, 532 U.S. 483, 497 (2001) (internal citation omitted).

As explained above, Congress determined that the Act would reduce the costs attributable to the poorer health and shorter life spans of the uninsured, lower health insurance premiums, improve financial security for families, and decrease the administrative costs of health care. Congress also determined that the minimum coverage provision is "essential" to achieving these results.  As millions of Americans struggle without health insurance, as medical expenses force them into personal bankruptcy, as the spiraling cost of health care encumbers the entire economy, it is not for plaintiffs to second-guess these legislative judgments as to what the public interest requires.

Granting a preliminary injunction now would place a cloud of uncertainty over the Act, impede the resolution of pressing national problems, and displace the policy judgments of those elected to make them.  Such extraordinary judicial intervention would be unwarranted in light of plaintiffs' failure to do more than speculate as to how they might be harmed at all, much less suffer irreparable injury.  In short, "the judgment of Congress, deliberately expressed in legislation," <u>Oakland Cannabis Buyers' Co-op.</u>, 532 U.S. at 497, as to the public interest far outweighs any alleged equities on the side of these four individual plaintiffs and TMLC.

## CONCLUSION

The motion for a preliminary injunction should be denied.

DATED:  May 11, 2010                    Respectfully submitted,

TONY WEST
Assistant Attorney General

IAN HEATH GERSHENGORN
Deputy Assistant Attorney General

BARBARA L. McQUADE
United States Attorney
Eastern District of Michigan

SHEILA LIEBER
Deputy Director

s/ Ethan P. Davis
ETHAN P. DAVIS (New York Bar)
JESSE Z. GRAUMAN
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
Ethan.P.Davis@usdoj.gov
Tel: (202) 514-9242
Fax: (202) 616-8470

33

## CERTIFICATE OF SERVICE

I hereby certify that on May 11, 2010, I electronically filed the foregoing paper with the Clerk of

the Court using the ECF system which will send notification of such filing to the following:

Robert Muise, Esq.; David Yerushalmi, Esq., and I hereby certify that I have mailed by United

States Postal Service the paper to the following non-ECF participants: NONE.

s/ Ethan P. Davis
ETHAN P. DAVIS (New York Bar)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
Tel: (202) 514-9242
Fax: (202) 616-8470
Ethan.P.Davis@usdoj.gov