UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS MORE LAW CENTER,
JANN DeMARS; JOHN CECI;
STEVEN HYDER; and SALINA HYDER,

        Plaintiffs,

vs.

Case No. 10-CV-11156

HON. GEORGE CARAM STEEH

BARACK HUSSEIN OBAMA, in his
official capacity as President of the
United States, et al.,

        Defendants.
_____/

ORDER DENYING PLAINTIFFS' MOTION FOR INJUNCTION AND
DISMISSING PLAINTIFFS' FIRST AND SECOND CLAIMS FOR RELIEF [DOC. #7]

        Plaintiffs Thomas More Law Center ("TMLC"), Jann DeMars, John Ceci, Steven Hyder, and Salina Hyder filed their complaint to challenge the constitutionality of the recently enacted federal law known as the "Patient Protection and Affordable Care Act" ("Health Care Reform Act" or "Act")[1], which was signed into law by President Obama on March 23, 2010. Plaintiffs seek a declaration that Congress lacked authority under the Commerce Clause to pass the Health Care Reform Act, and alternatively a declaration that the penalty provision of the Act is an unconstitutional tax. In addition, plaintiffs allege that the Health Care Reform Act violates states' rights under the Tenth Amendment, the Free Exercise Clause, and the Fifth Amendment's Equal Protection and Due Process Clauses.

        The matter is presently before the court on plaintiffs' motion for a preliminary

---

[1] Pub. L. No. 111-148, 124 Stat. 119 (2010), amended by the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (2010).

injunction. As agreed to by the parties, and subsequently ordered by the court, trial and the preliminary injunction hearing on plaintiffs' Commerce Clause and tax power claims have been consolidated pursuant to Fed. R. Civ. P. 65(a)(2). Also, the parties agree that there are no factual disputes to be resolved by the court before the matter can be decided as a matter of law. Oral argument was heard July 21, 2010.

## FACTUAL BACKGROUND

The Health Care Reform Act seeks to reduce the number of uninsured Americans and the escalating costs they impose on the health care system. In an attempt to make health insurance affordable and available, the Act provides for "health benefit exchanges," allowing individuals and small businesses to leverage their collective buying power to obtain prices competitive with group plans. Act §§ 1311, 1321. It provides for incentives for expanded group plans through employers, id. §§ 1421, 1513, affords tax credits for low-income individuals and families, id. §§ 1401-02, extends Medicaid, id. § 2001, and increases federal subsidies to state-run programs. Id. § 2001(a)(3)(B). The Act also prohibits insurance companies from denying coverage to those with pre-existing medical conditions, setting eligibility rules based on medical factors or claims experience, or rescinding coverage other than for fraud or misrepresentation. Id. §§ 1001, 1201.

Integral to the legislative effort to lower the cost of health insurance, expand coverage, and reduce uncompensated care is the so called minimum coverage provision which requires that every United States citizen, other than those falling within specified exceptions, maintain "minimum essential coverage" for health care for each month beginning in the year 2014. If an individual fails to comply with this requirement, the Act imposes a penalty to be included with a taxpayer's return.

Congress determined that the Individual Mandate[2] "is an essential part of this larger regulation of economic activity," and that its absence "would undercut Federal regulation of the health insurance market." Id. § 1501(a)(2)(H). Congress found that without the Individual Mandate, the reforms in the Act, such as the ban on denying coverage based on pre-existing conditions, would increase the existing incentives for individuals to "wait to purchase health insurance until they needed care," which in turn would shift even greater costs onto third parties. Id. § 1501(a)(2)(I). Conversely, Congress found that by "significantly reducing the number of the uninsured, the requirement, together with the other provisions of this Act, will lower health insurance premiums." Id. § 1501(a)(2)(I). Congress concluded that the Individual Mandate "is essential to creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be sold." Id.

Plaintiff Thomas More Law Center ("TMLC") is a national public interest law firm based in Ann Arbor, Michigan. TMLC's employees receive health care through an employer health care plan sponsored and contributed to by TMLC. TMLC's health care plan is subject to the provisions and regulations of the Health Care Reform Act. The individual plaintiffs are United States citizens, Michigan residents, and federal taxpayers. None of them have private health care insurance, and each of them objects to being compelled by the federal government to purchase health care coverage. They contend that if they do not purchase health insurance and are forced to pay a tax, such tax money would

---

[2]The term "Individual Mandate" in the pleadings and in this opinion refers to the minimum coverage provision of the Act which requires that all private citizens maintain minimum essential coverage under penalty of federal law.

go into the general fund and could go to fund abortions. Each of the individual plaintiffs objects to being forced by the federal government to contribute in any way to the funding of abortions.

## ANALYSIS

I. Standing

Under Article III of the Constitution, a party must demonstrate standing in order to satisfy the "case or controversy" requirement necessary for a federal court to exercise its judicial power. The Supreme Court set forth three elements to establish standing in Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992):

> (1) Plaintiff must have suffered an injury in fact - an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) There must be a causal connection between the injury and the conduct complained of - the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) It must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

The first element is disputed by the parties in this case.

Plaintiff TMLC describes itself as a "national, public interest law firm" that "educate[s] and defend[s] the citizens of the United States with respect to their constitutional rights and liberties." TMLC does not assert any injury to itself as an employer or organization; rather, it "objects . . . through its members . . . to being forced to purchase health care coverage." "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Friends of Earth v. Laidlaw

4

Environ. Servs., 528 U.S. 167, 181 (2000) (citation omitted). Plaintiffs Jann DeMars and Steven Hyder are members of TMLC, but plaintiffs John Ceci and Salina Hyder are not. The individual plaintiffs assert that they do not have private health insurance and object "to being compelled by the federal government to purchase health care coverage." Plaintiffs claim they have "arranged their personal affairs such that it will be a hardship for them to have to either pay for health insurance that is not necessary or face penalties under the Act."

According to plaintiff DeMars, a basic health care policy will cost approximately $8,832.00 per year, and to add one child will increase the cost to $9,914.28 per year. (DeMars' Suppl. Decl. ¶ 4). For standing, plaintiffs describe their injury as being subjected to an unconstitutional regulation causing present economic injury and forcing a change in behavior with a significant possibility of future harm. Plaintiff Hyder states, "I have arranged my personal affairs such that it will be a hardship for me and my family to have to either pay for health insurance that is not necessary or desirable or face penalties under the Act." (Hyder Decl. ¶5). The Act was signed into law on March 23, 2010, so the minimum coverage provision is already law, there is no condition precedent necessary, nor is there any subsequent regulation required to make it so.

It is true that the minimum coverage provision does not become effective until 2014. The provision thus neither imposes obligations on plaintiffs nor exacts revenue from them before that time. Furthermore, the Act might not affect plaintiffs after 2014, if, for instance, changed health circumstances or other events lead plaintiffs voluntarily to satisfy the minimum coverage provision by buying insurance. They may also satisfy the provision by obtaining employment that includes a health insurance benefit. Indeed, the Act encourages

5

employers to provide insurance to employees. Even if they do not obtain insurance, plaintiffs may have insufficient income in 2014 to become liable for any penalty.

Defendants focus on plaintiffs' assertion of future harm, pointing out that "[a]llegations of possible future injury do not satisfy the requirements of Art. III. A threatened injury must be certainly impending to constitute injury in fact." Rosen v. Tenn. Comm'r of Fin. & Admin., 288 F.3d 918, 929 (6th Cir. 2002) (citation omitted). A plaintiff who "alleges only an injury at some indefinite future time" has not shown an injury in fact, particularly where "the acts necessary to make the injury happen are at least partly within the plaintiff's own control." Lujan, 504 U.S. at 564 n.2. In these situations, "the injury [must] proceed with a high degree of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all." Id. Plaintiffs facing a real and certain threat of future harm need not wait for the realization of that harm to bring suit. Rosen, 288 F.3d at 929 (citations omitted). The future threat, however, must be "real and immediate," not "conjectural or hypothetical." Id. (citation omitted).

The plaintiffs in this case allege a present harm in addition to a future harm, which, if present, would be enough to establish standing. Plaintiffs describe their *present* injury as being compelled to "reorganize their affairs." An economic injury can satisfy the requirements of Article III, but such injury must be fairly traceable to the Act. See, Linton v. Commissioner of Health & Env't, 973 F.2d 1311, 1316 (6th Cir. 1992). A plaintiff's alleged injury is not "fairly traceable" to a challenged provision if that injury "stems not from the operation of [the provision] but from [his] own . . . personal choice." McConnell v. FEC, 540 U.S. 93, 228 (2003). For example, the Seventh Circuit found that soybean farmers lacked standing to allege antitrust violations arising out of a Board of Trade resolution

6

because the farmers, who claimed they refrained from selling soybeans due to depressed prices caused by the resolution, could not show that their injuries were fairly traceable to the resolution. The court recognized it would never be able to determine whether a particular farmer refrained from selling soybeans because of price, as opposed to excessive transportation costs, low storage costs, or some other reason. Sanner v. Board of Trade, 62 F.3d 918, 923 (7th Cir. 1995).

One of the plaintiffs in this case may decide not to buy a movie ticket because the money he or she previously allocated to entertainment is now allocated to saving for health insurance. However, the court is not required to determine if every financial decision made by plaintiffs is caused by the Individual Mandate. The economic burden due to the Individual Mandate is felt by plaintiffs regardless of their specific financial behavior. The Act does not make insurance more costly, in fact the contrary is expected; rather the Act requires plaintiffs to purchase insurance when they otherwise would not have done so. This case is distinguishable from Sanner because the government is requiring plaintiffs to undertake an expenditure, for which the government must anticipate that significant financial planning will be required. That financial planning must take place well in advance of the actual purchase of insurance in 2014.

Plaintiffs' decisions to forego certain spending today, so they will have the funds to pay for health insurance when the Individual Mandate takes effect in 2014, are injuries fairly traceable to the Act for the purposes of conferring standing. There is nothing improbable about the contention that the Individual Mandate is causing plaintiffs to feel economic pressure today. See Friends of Earth, 528 U.S. at 184. In fact, the proposition that the Individual Mandate leads uninsured individuals to feel pressure to start saving money today

to pay more than $8,000 for insurance, per year, starting in 2014, is entirely reasonable. See id. at 184-85. Parents wishing to send their child to college often start saving money for that purpose as soon as the child is born, even though the expense will not be incurred for eighteen years. And while such parents may be diligent in their saving, making many sacrifices along the way, their child might earn a scholarship to college, or decide to forego higher education, thus rendering the parents' sacrifices unnecessary. Such outcomes, however, do not diminish the real financial burden felt by the parents in earlier years.

For purposes of standing, the court looks at the circumstances as they exist at the filing of the complaint. Lynch v. Leis, 382 F.3d 642, 647 (6th Cir. 2004); Cleveland Branch, N.A.A.C.P. v. City of Parma, 263 F.3d 513, 524 (6th Cir. 2001). This court finds that the injury-in-fact in this case is the present financial pressure experienced by plaintiffs due to the requirements of the Individual Mandate. If something happens to change plaintiffs' circumstances in the future, such as coverage by employer-provided insurance, the case may very well become moot. See Becker v. Federal Election Com'n, 230 F.3d 381, 386 n.3 (1st Cir. 2000). Given their current circumstances, the individual named plaintiffs do have standing to bring their constitutional challenge to the Individual Mandate provision of the Health Care Reform Act and TMLC has standing to advance its challenge on behalf of its members.

II. Ripeness

In considering whether an issue is ripe for review, courts are to "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967). The rationale of the

ripeness inquiry is to "prevent courts, through avoidance of premature adjudication, from entangling themselves in abstract disputes." Id. at 148.

It certainly appears that the government has an interest in knowing sooner, rather than later, whether an essential part of its program regulating the national health care market is constitutional, although in this case it is not the government asking for the review. The Sixth Circuit has held that a claim is ripe when it is "highly probable" that the alleged harm or injury will occur. Kardules v. City of Columbus, 95 F.3d 1335, 1344-46 (6th Cir. 1996). Pending the outcome of the numerous legal challenges to the Act, the imposition of the Individual Mandate is highly probable, as is the penalty provision. This case presents a purely legal issue which "would not be clarified by further factual development." Abbott Labs, 387 U.S. at 149. Therefore, this case is ripe for consideration by the court.

III. Anti-Injunction Act

In its prayer for relief, plaintiffs ask the court to declare the Health Care Reform Act unconstitutional and to enjoin its enforcement. The Individual Mandate provides that, beginning in 2014, taxpayers subject to the minimum coverage provision who fail to obtain qualifying coverage will be assessed a penalty, reportable with their tax returns. Defendants argue that the relief sought by plaintiffs would restrain the federal government from collecting the penalty, and plaintiffs' lawsuit is therefore barred by the Anti-Injunction Act.

The Anti-Injunction Act provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421(a). The purpose of the Anti-Injunction Act is to preserve the government's

ability to collect assessments expeditiously with 'a minimum of preenforcement judicial interference" and "to require that the legal right to the disputed sums be determined in a suit for refund." Bob Jones Univ. v. Simon, 416 U.S. 725, 736 (1974).

The Internal Revenue Service has not assessed a tax pursuant to the Health Care Reform Act, nor has it taken any action that could reasonably be expected to lead to the assessment or collection of such a tax. This is because the Individual Mandate, which contains the tax consequence, does not go into effect until 2014. Individuals to whom the Individual Mandate applies, who do not obtain qualifying health care coverage in 2014, will be obligated to pay a penalty tax with their 2014 return filed in 2015. Cases in which the Anti-Injunction Act has been found to bar a suit all involve a challenge to an action of the IRS which resulted in, or was expected to result in, the assessment or collection of a tax. See e.g., Bob Jones Univ., supra (Anti-Injunction Act barred suit seeking to enjoin IRS from revoking ruling letter which declared University had tax-exempt status); J. L. Enochs v. Williams Packing & Navigation Co., 370 U.S. 1 (1962) (Anti-Injunction Act barred suit to enjoin collection of social security and unemployment taxes assessed); Bell v. Rossotti, 227 F.Supp.2d 315 (M.D. Pa. 2002) (Anti-Injunction Act barred suit to enjoin IRS investigation of whether plaintiff's tax advice website violated section of Revenue Code prohibiting the promotion of tax shelters, where investigation could lead to the assessment and collection of taxes from individuals using plaintiff's methods).

Defendants have advanced no authority for applying the Anti-Injunction Act to bar lawsuits when no attempt to collect, or otherwise act affirmatively, has been taken by the IRS. In the pending matter, the IRS has not taken any steps to assess or collect a tax. The plaintiffs, in fact, make it clear that they intend to purchase minimum essential coverage if

the Individual Mandate is upheld so as not to be subject to the penalty, which could go to fund abortions.

In any event, the Anti-Injunction Act does not bar the court from considering the declaratory relief sought by plaintiffs.  The constitutional issues raised go well beyond the availability or not of an injunction, or the terms of possible injunctive relief.  Also, the provisions of the Health Care Reform Act at issue here, for the most part, have nothing to do with the assessment or collection of taxes.  The declaratory relief sought in this case is primarily directed at the statutory requirement that individuals obtain health insurance coverage as provided.  The plaintiffs have a right to a court determination of the constitutional authority of Congress to enact the statute in the first place.

IV.  Congressional Power to Regulate Interstate Commerce

The Individual Mandate requires that each "applicable individual" purchase health insurance, or be subject to a "penalty" or "Shared Responsibility Payment."  The definition of "applicable individual" is "an individual other than" religious objectors who oppose health insurance in principle, non-residents or illegal residents, and incarcerated individuals.  The Act, and the Individual Mandate, therefore, apply to everyone living in the United States, unless they are excepted.

The crux of plaintiffs' argument is that the federal government has never attempted to regulate inactivity, or a person's mere existence within our Nation's boundaries, under the auspices of the Commerce Clause.  It is plaintiffs' position that if the Act is found constitutional, the Commerce Clause would provide Congress with the authority to regulate every aspect of our lives, including our choice to refrain from acting.

The Constitution grants Congress the authority to "regulate Commerce . . . among the several States . . . ." U.S. Const. art. I, § 8, cl. 3.  In the body of jurisprudence interpreting the Commerce Clause, the Supreme Court has set out a three-prong analysis to determine if a federal law properly falls within this enumerated grant of authority.  This inquiry presumes that Congress may regulate: (1) "the use of the channels of interstate commerce," such as regulations covering the interstate shipment of stolen goods; (2) to protect "the instrumentalities of interstate commerce, or persons or things in interstate commerce," such as legislation criminalizing the destruction of aircraft and theft from interstate commerce; and (3) "those activities that substantially affect interstate commerce." United States v. Lopez , 514 U.S. 549, 558-59 (1995); see also, Perez v. United States, 402 U.S. 146, 150 (1971).  It is the last category, which deals with local activities that in themselves do not participate in interstate commerce, but which nonetheless "substantially affect" interstate commerce, which is the focus of this case.

"In assessing the scope of Congress' authority under the Commerce Clause," the court's task "is a modest one." Gonzalez v. Raich, 545 U.S. 1, 22 (2005).  The court need not itself determine whether the regulated activities, "taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." Id.

The Supreme Court has expanded the reach of the Commerce Clause to reach purely local, non-commercial activity, simply because it is an integral part of a broader statutory scheme that permissibly regulates interstate commerce.  Two cases, decided sixty years apart, demonstrate the breadth of the Commerce power and the deference accorded Congress's judgments.

In Wickard v. Filburn, 317 U.S. 111 (1942), the Supreme Court upheld a penalty on wheat grown for home consumption despite the farmer's protest that he did not intend to put the commodity on the market.  For purposes of Congress invoking its Commerce Clause power, the Court held it was sufficient that the existence of home-grown wheat, in the aggregate, could "suppl[y] a need of the man who grew it which would otherwise be reflected by purchases in the open market," thus undermining the efficacy of the federal price stabilization scheme.  Id. at 128.  The Supreme Court's decision in Gonzales v. Raich, handed down in 2005, also supports the notion that the Commerce Clause affords Congress broad power to regulate even purely local matters that have substantial economic effects.  There, the Supreme Court sustained Congress's authority to prohibit the possession of home-grown marijuana intended solely for personal use.  The Controlled Substances Act "regulates the production, distribution, and consumption of commodities for which there is an established, and lucrative, interstate market."  Raich, 545 U.S. at 26.  The restriction on home-grown marijuana for personal use was essential to the Act's broader regulatory scheme.  In both Wickard and Raich, the Supreme Court sustained Congress's power to impose obligations on individuals who claimed not to participate in interstate commerce, because those obligations were components of broad schemes regulating interstate commerce.

Far from permitting the Commerce Clause to provide Congress with unlimited power to regulate, the Supreme Court has, in fact, placed limits on its reach.  The Court was asked to review Congress's power to enact the Gun-Free School Zone Act of 1990 which criminalized possession of a gun within a statutorily defined school zone.  United States v. Lopez, 514 U.S. 549 (1995).  The government argued that possession of a firearm in a

school zone may result in violent crime, which can be expected to affect the national economy in several ways. First, the costs of violent crime are substantial, and via insurance those costs are spread throughout the population. Second, violent crime reduces the willingness of individuals to travel to areas that are perceived to be unsafe. Finally, the presence of guns in schools threatens the educational process, which will result in a less productive citizenry. The government concluded that these adverse effects on the nation's economic well-being gave Congress the power to pass the Gun-Free School Zone Act under the Commerce Clause. The Lopez Court held that Congress could not "pile inference upon inference" to find a link between the regulated activity and interstate commerce. Id. at 567. Ultimately, the Court concluded that possessing a gun in a school zone was not an economic activity. Nor was the prohibition against possessing a gun "an essential part[] of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." Id. at 561. Clearly, the Gun-Free School Zone Act was first and foremost about providing a safe environment for students in the areas surrounding their schools, as opposed to an economic regulation.

Similarly, in United States v. Morrison, 529 U.S. 598 (2000), the Court invalidated the cause of action created in the Violence Against Women Act, finding that any link between gender-motivated violence and economic activity could be established only through a chain of speculative assumptions. Id. at 615. In declining to accept Congress's rationale for regulating under the Commerce Clause because gender-motivated violence deters "potential victims from traveling interstate, from engaging in employment in interstate business, . . . and by diminishing national productivity . . . ", the Court strove to preserve

the "distinction between what is truly national and what is truly local." Id. at 615, 617-18 (citation omitted).

In Morrison and Lopez, the Court found that the statutes at issue legislated non-commercial activities. Plaintiffs in the present case focus on the common fact that each of the regulations that survived Supreme Court scrutiny under the Commerce Clause regulated an economic "activity," as opposed to the "inactivity" they have demonstrated by merely existing and not purchasing health care insurance. The Supreme Court has always required an economic or commercial component in order to uphold an act under the Commerce Clause. The Court has never needed to address the activity/inactivity distinction advanced by plaintiffs because in every Commerce Clause case presented thus far, there has been some sort of activity. In this regard, the Health Care Reform Act arguably presents an issue of first impression. Plaintiffs contend that the court must engage in metaphysical gymnastics in order to find that "the act not to purchase insurance" is an affirmative economic activity, specifically "a choice regarding the method of payment." According to plaintiffs, this is the type of inferential chain prohibited by Lopez and its progeny.

In its legislative findings, Congress explains that it enacted the Health Care Reform Act to address a national crisis - an interstate health care market in which tens of millions of Americans are without insurance coverage and in which the cost of medical treatment has spiraled out of control. The government explains that as part of a comprehensive reform to reduce the ranks of the uninsured, the Act regulates economic decisions regarding the way in which health care services are paid for. The government contends that the Individual Mandate falls within Congress' authority under the Commerce Clause

for two principal reasons. First, the economic decisions that the Act regulates as to how to pay for health care services have direct and substantial impact on the interstate health care market. Second, the minimum coverage provision is essential to the Act's larger regulation of the interstate business of health insurance.

### A. Substantial Effect on Interstate Commerce

There is a rational basis to conclude that, in the aggregate, decisions to forego insurance coverage in preference to attempting to pay for health care out of pocket drive up the cost of insurance. The costs of caring for the uninsured who prove unable to pay are shifted to health care providers, to the insured population in the form of higher premiums, to governments, and to taxpayers. The decision whether to purchase insurance or to attempt to pay for health care out of pocket, is plainly economic. These decisions, viewed in the aggregate, have clear and direct impacts on health care providers, taxpayers, and the insured population who ultimately pay for the care provided to those who go without insurance. These are the economic effects addressed by Congress in enacting the Act and the minimum coverage provision.

The health care market is unlike other markets. No one can guarantee his or her health, or ensure that he or she will never participate in the health care market. Indeed, the opposite is nearly always true. The question is how participants in the health care market pay for medical expenses - through insurance, or through an attempt to pay out of pocket with a backstop of uncompensated care funded by third parties. This phenomenon of cost-shifting is what makes the health care market unique. Far from "inactivity," by choosing to forgo insurance plaintiffs are making an economic decision to try to pay for health care services later, out of pocket, rather than now through the purchase of insurance,

collectively shifting billions of dollars, $43 billion in 2008, onto other market participants. As this cost-shifting is exactly what the Health Care Reform Act was enacted to address, there is no need for metaphysical gymnastics of the sort proscribed by Lopez.

The plaintiffs have not opted out of the health care services market because, as living, breathing beings, who do not oppose medical services on religious grounds, they cannot opt out of this market. As inseparable and integral members of the health care services market, plaintiffs have made a choice regarding the method of payment for the services they expect to receive. The government makes the apropos analogy of paying by credit card rather than by check. How participants in the health care services market pay for such services has a documented impact on interstate commerce. Obviously, this market reality forms the rational basis for Congressional action designed to reduce the number of uninsureds.

The Supreme Court has consistently rejected claims that individuals who choose not to engage in commerce thereby place themselves beyond the reach of the Commerce Clause. See, e.g., Raich, 545 U.S. at 30 (rejecting the argument that plaintiffs' home-grown marijuana was "entirely separated from the market"); Wickard, 317 U.S. at 127, 128 (home-grown wheat "competes with wheat in commerce" and "may forestall resort to the market"); Heart of Atlanta Motel v. United States, 379 U.S. 241 (1964) (Commerce Clause allows Congress to regulate decisions not to engage in transactions with persons with whom plaintiff did not wish to deal). Similarly, plaintiffs in this case are participants in the health care services market. They are not outside the market. While plaintiffs describe the Commerce Clause power as reaching economic *activity*, the government's characterization of the Commerce Clause reaching economic *decisions* is more accurate.

B. <u>Essential to Broader Regulatory Scheme</u>

The Act regulates a broader interstate market in health care services. This is not a market created by Congress, it is one created by the fundamental need for health care and the necessity of paying for such services received. The provision at issue addresses cost-shifting in those markets and operates as an essential part of a comprehensive regulatory scheme. The uninsured, like plaintiffs, benefit from the "guaranteed issue" provision in the Act, which enables them to become insured even when they are already sick. This benefit makes imposing the minimum coverage provision appropriate.

The Supreme Court recognized Congress's power to regulate wholly intrastate, wholly non-economic matters that form "'an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated.'" <u>Raich</u>, 545 U.S. at 24-25 (quoting <u>Lopez</u>, 514 U.S. at 561). In 2014, the Act will bar insurers from refusing to cover individuals with pre-existing conditions and from setting eligibility rules based on health status or claims experience. Act § 1201. At that time, all Americans will be insurable. Without the minimum coverage provision, there would be an incentive for some individuals to wait to purchase health insurance until they needed care, knowing that insurance would be available at all times. As a result, the most costly individuals would be in the insurance system and the least costly would be outside it. In turn, this would aggravate current problems with cost-shifting and lead to even higher premiums. The prospect of driving the insurance market into extinction led Congress to find that the minimum coverage provision was essential to the larger regulatory scheme of the Act. Act § 1501(a)(2)(I) and (J).

The minimum coverage provision, which addresses economic decisions regarding health care services that everyone eventually, and inevitably, will need, is a reasonable means of effectuating Congress's goal.

V. <u>Congressional Power to Tax and Spend to Provide for the General Welfare</u>

Having concluded that Congress has the power under the Commerce Clause to enact the Health Care Reform Act, it is unnecessary for the court to address the issue of Congress's alternate source of authority to tax and spend under the General Welfare Clause. U.S. Const. Art. I, § 8, cl. 1. Plaintiffs also challenge the constitutionality of the tax imposed by the Act as being an improperly apportioned direct tax. However, Congress is authorized by the Commerce Clause to impose a sanction "as a means of constraining and regulating what may be considered by the Congress as pernicious or harmful to commerce." <u>Rodgers v. United States</u>, 138 F.2d 992, 995 (6th Cir. 1943) (upholding penalty provision of Agricultural Adjustment Act for exceeding quota of permissible cotton sales as exercise of Congress's power to regulate commerce, where purpose of statute was not levying a tax but regulating the production of cotton affecting interstate commerce).

The constitutional limits on taxes argued by plaintiffs relate to taxation generally for the purposes of raising revenue. While these might be legitimate concerns if Congress had to rely on its power conferred by the General Welfare Clause, such is not the case with regard to penalties imposed incidentally under the Commerce Clause. <u>Id</u>. In this case, the minimum coverage provision of the Health Care Reform Act contains two provisions aimed at the same goal. Congress intended to increase the number of insureds and decrease the cost of health insurance by requiring individuals to maintain minimum essential coverage or face a penalty for failing to do so. Because the "penalty" is incidental to these purposes,

plaintiffs' challenge to the constitutionality of the penalty as an improperly apportioned direct tax is without merit.

## VI. Injunctive Relief

The purpose of a preliminary injunction is to "preserve the relative positions of the parties until a trial on the merits can be held." University of Texas v. Camenisch, 451 U.S. 390, 395 (1981). In this case, the court consolidated the hearing on preliminary injunction with a trial on the merits pursuant to Fed. R. Civ. P. 65(a)(2). Plaintiffs' claim that the minimum coverage provision of the Health Care Reform Act is unconstitutional under the Commerce Clause has failed on the merits. Defendants have also succeeded in overcoming plaintiffs' challenge to the penalty provision of the Individual Mandate. As these are the only issues before the court at this time, further consideration of plaintiffs' application for injunctive relief is not necessary.

## CONCLUSION

For the reasons given above, plaintiffs' motion for preliminary injunction is DENIED and the court finds for defendants on plaintiffs' first and second claims for relief; those claims are DISMISSED.

Dated:  October 7, 2010

                                        S/George Caram Steeh
                                        GEORGE CARAM STEEH
                                        UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on October 7, 2010, by electronic and/or ordinary mail.

S/Josephine Chaffee
Deputy Clerk

---